FILED
United States Court of Appeals
Tenth Circuit

August 10, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

DANNY MANZANARES,

Plaintiff–Appellant,

v.

SEAN HIGDON, an officer of the
Albuquerque Police
Department, in his individual capacity,

Defendant–Appellee.

No. 07-2156

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:05-CV-00095-WJ/LFG)**

Dennis W. Montoya, Montoya Law, Inc., Rio Rancho, New Mexico, for
Plaintiff–Appellant.

Kathryn Levy, Deputy City Attorney, City of Albuquerque Legal Department,
Albuquerque, New Mexico, for Defendant–Appellee.

Before **TACHA**, **EBEL**, and **LUCERO**, Circuit Judges.

**LUCERO**, Circuit Judge.

We are asked to decide whether law enforcement officers may remain in a home absent probable cause when consent to enter is granted but later revoked. We also consider whether the Fourth Amendment permits detention of an individual for the duration of an investigation based on a police hunch that the individual may provide aid to a suspect if allowed to leave police custody. Our jurisdiction arises under 28 U.S.C. § 1291. We reverse and remand for the district court to enter judgment as a matter of law in favor of Danny Manzanares on both of his substantive claims and hold a new trial on damages.

**I**

**A**

In the early morning hours of March 16, 2002, Officer Sean Higdon of the Albuquerque Police Department ("APD") received a call from an Albuquerque Police dispatcher regarding an alleged rape.[1]  Another APD Officer, Jason Morales, had spoken with a Danny Manzanares earlier in the night, and Morales had relayed his belief that Manzanares could help police contact an alleged suspect in the rape, later determined to be Miguel "Rick" Maestas.  Officers Higdon and David Saladin went to the Manzanares home to investigate Morales' suspicion.  Manzanares himself was not suspected of any crime at that point.

_____

[1] Because we are reviewing the denial of a motion for judgment as a matter of law, "[w]e consider the evidence, and any inferences drawn therefrom, in favor of the non-moving party," in this case, Higdon.  Brown v. Gray, 227 F.3d 1278, 1285 (10th Cir. 2000).  Accordingly, we recite the facts as recounted by Higdon at trial unless otherwise noted.

Higdon and Saladin arrived at the Manzanares home at approximately 5:50 a.m.[2] They found Manzanares to be polite and cooperative. On answering the door, he promptly invited the officers inside. Manzanares told the officers that he and the suspect, Maestas, worked together and proceeded to provide police the name of the suspect's supervisor. Manzanares confirmed descriptions of the suspect's vehicle and home but told the officers that he did not know the suspect's last name or address. Eventually, Manzanares decided to end the interview and asked the officers to leave his home. When the officers refused, Manzanares became agitated. In response, Higdon handcuffed him. At the later trial, Higdon testified that he did so for safety reasons and out of concern that Manzanares might warn the suspect if released. Higdon could not precisely recall how long Manzanares was handcuffed in his home but estimated that it was a matter of minutes.

Officer Higdon was also asked whether he had an articulable basis to believe Manzanares needed to be handcuffed. Higdon replied, "I was in somebody's house. I don't know anything about this person or what weapons he may have accessible to him in his own house." He further explained, "I felt the

_____

[2] At trial, the parties hotly disputed the timing of a number of events, including the time at which the officers first arrived at the Manzanares home. Manzanares testified that the officers arrived much earlier than 5:50 a.m.—the time Higdon provided after his recollection was refreshed by a police report. Because we must take the facts in the light most favorable to the jury's verdict, see Brown, 227 F.3d at 1285, we accept the latest time of arrival.

- 3 -

need to put him in handcuffs, so I mean, I wouldn't have just put him in handcuffs for no reason." Higdon acknowledged that Manzanares was not suspected of a crime.

After learning that additional investigators were en route to the Manzanares home, Higdon asked Manzanares whether he would prefer to remain in his home until the investigators arrived or wait in the back of a police vehicle. Manzanares opted to remain in the home with the officers, and Higdon removed his handcuffs. Following Sergeant Christine Chester's arrival on the scene, at approximately 8:00 a.m., Manzanares admitted that he knew the suspect's name to be Miguel Maestas, and agreed to guide police to his home. He had at least twice previously denied knowing the suspect's last name or address.

For his cooperation, Manzanares was repaid many times over. Higdon and Saladin handcuffed him again, locking him in the rear seat of their squad car. The officers, with Manzanares in tow, arrived at Maestas' home at 9:11 a.m.[3] They left Manzanares handcuffed in the backseat and exited the vehicle. Higdon testified that he did so in the interest of safety and because Manzanares was trying to help his friend, Maestas.[4] When Maestas did not answer his door, some

_____

[3] By Manzanares' account, he was taken from his home to Maestas' home at 5:00 a.m.

[4] The only basis we discern for asserting that Manzanares would help Maestas is Manzanares' initial refusal to share detail with police. That Higdon continued to fear that Manzanares would help Maestas seems odd, given that by

(continued...)

officers sought a warrant while others secured the perimeter.

Police remained outside Maestas' home for several hours. All the while, Manzanares was handcuffed and locked in the backseat of the squad car. Police sought no further information from him, and Higdon explained that he continued to detain Manzanares only because he feared that Manzanares might impede the investigation if freed. When Maestas finally exited his house and was taken into custody, Higdon returned Manzanares to his home—around 12:25 p.m. According to Higdon's timeline, Manzanares was detained in handcuffs in the squad car for more than three hours.[5]

---

[4](...continued)
this time Manzanares had provided the requested information and led police to Maestas' home. Nonetheless, because of the procedural posture of the case, we do not question the credibility of his explanation. Brown, 227 F.3d at 1285.

[5] Manzanares testified that the conditions in the car were oppressive, with the officers intentionally blasting the heat and music while he was alone in the car. According to Manzanares, when he asked to be taken home, Higdon yelled in response, "Your rapist friend is not cooperating. You're going to have to wait with us." Each time the officers returned to the car after that, Manzanares knocked on the plexiglass barrier between the front and back seats to try to get their attention. At one point, Saladin opened the back door, and Mazanares dry heaved. Saladin apologized but refused to allow Manzanares to leave and again closed the door. Manzanares testified that he suffered headaches, stomachaches, dry heaves, and dehydration.
After police made contact with Maestas, Higdon and Saladin returned to the vehicle but did not release Manzanares until after they had completed writing their reports. Throughout this time, Manzanares remained handcuffed in the back seat of the car. By Manazanares' timeline, he was detained in the car for approximately seven hours, from 5 a.m. to 12 p.m.

**B**

Following this encounter, Manzanares brought suit against Higdon under 42 U.S.C. § 1983, asserting two claims based on violations of the Fourth Amendment and a third claim for punitive damages. At the conclusion of Manzanares' case in chief, Higdon moved for judgment as a matter of law, see Fed. R. Civ. P. 50, arguing that his actions were objectively reasonable. The court took Higdon's motion under advisement. On the conclusion of the presentation of his case, Higdon renewed his motion for judgment as a matter of law. Manzanares moved for judgment as a matter of law on all three of his claims. The district court again took the motions under advisement and submitted the case to the jury.

The jury returned a verdict in favor of Higdon on all claims. Manzanares then renewed his motion for judgment as a matter of law. Concluding that reasonable inferences could be drawn to support Higdon's theory of the case and the jury verdict, the district court denied Manzanares' motion. Because the jury's verdict for Higdon was undisturbed, the district court denied Higdon's motion as moot. After entry of judgment, Manzanares again renewed his motion for judgment as a matter of law and moved for a new trial, see Fed. R. Civ. P. 59(a), on the basis of his contention that the jury was erroneously instructed. Both motions were summarily denied. Manzanares appeals.

## II

Because a motion for judgment as a matter of law presents purely legal arguments, we review a district court's disposition of such a motion de novo. Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 685 (10th Cir. 2007). Judgment as a matter of law is appropriate only when the evidence presented at trial does not permit a reasonable jury to find for the non-movant. Fed. R. Civ. P. 50(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). It is "warranted only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." Herrera, 474 F.3d at 685 (quotation omitted). "[W]e will not weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury." Brown, 227 F.3d at 1285 (quotation omitted).

## A

We consider Manzanares' contention that he is entitled to judgment as a matter of law on his claim that Higdon violated the Fourth Amendment by refusing to exit the Manzanares home. In doing so, we apply the traditional two-part qualified immunity framework, considering first the existence of a constitutional violation and next whether the law as to that violation was clearly established.[6] Weigel v. Broad, 544 F.3d 1143, 1151 (10th Cir. 2008).

---

[6] The Supreme Court made this "order of battle" discretionary in Pearson v. Callahan, 129 S. Ct. 808, 818 (2009). Because we conclude that both inquiries

(continued...)

Our analysis centers on the critical fact that the encounter at issue occurred in the Manzanares home.  Although the Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," its foremost concern is the home.  Georgia v. Randolph, 547 U.S. 103, 115 (2006); United States v. U.S. Dist. Ct., 407 U.S. 297, 313 (1972).  Warrantless searches and seizures in the home are presumptively unreasonable.  Groh v. Ramirez, 540 U.S. 551, 559 (2004); United States v. Gambino-Zavala, 539 F.3d 1221, 1225 (10th Cir. 2008).  "[E]ven when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within" a home, police may not enter without a warrant absent exigent circumstances.  Groh, 540 U.S. at 559 (quoting Payton v. New York, 445 U.S. 573, 587-88 (1980)).  The sphere of "exigent circumstances" is highly circumscribed.  See Randolph, 547 U.S. at 117 n.6 (collecting cases).

Despite its fundamental nature, the warrant requirement for entry into a home has a few carefully established exceptions.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  One such exception, the consensual encounter, does not require a warrant because it is not a search or seizure for Fourth Amendment purposes.  Cortez v. McCauley, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc).

---

[6](...continued)
are necessary to our analysis, we adhere to the traditional order of battle.

Such encounters are limited by the scope of consent given. Gates v. Tex. Dep't of Protective & Regulatory Servs., 537 F.3d 404, 426 (5th Cir. 2008); United States v. West, 219 F.3d 1171, 1177 (10th Cir. 2000); see also Florida v. Jimeno, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"). Thus, as soon as an individual has "an objective reason to believe that he is not free to terminate [an encounter]," he is "seized," and the Fourth Amendment is implicated. United States v. Patten, 183 F.3d 1190, 1194 (10th Cir. 1999). As an exception to the warrant requirement, we take care to "jealously and carefully draw[]" the boundaries of consent, lest the warrant requirement be subsumed by the exception. Randolph, 547 U.S. at 109 (quoting Jones v. United States, 357 U.S. 493, 499 (1958)).

There is no question that Higdon's original entry into the Manzanares home was consensual. Nor can there be a legitimate dispute that consent was later withdrawn. Manzanares unequivocally asked Higdon and Saladin to leave. In Higdon's words, "He didn't want us there anymore." See Gates, 537 F.3d at 426 ("[C]onsent which waives Fourth Amendment rights may be limited, qualified, or withdrawn." (quotation omitted)); Painter v. Robertson, 185 F.3d 557, 567 (6th Cir. 1999) ("[T]he consenting party may limit the scope of that search, and hence

at any moment may retract his consent." (citing <u>Jimeno</u>, 500 U.S. at 251-52) (additional citations omitted)).

When Manzanares asked the officers to leave, the consensual encounter ended; Manzanares was "seized," and Higdon's continued presence was permitted only if it comported with the Fourth Amendment.  <u>Gates</u>, 537 F.3d at 426 ("[I]f . . . [one of the plaintiffs] revoked that consent upon his return home, the defendants violated the [plaintiffs'] Fourth Amendment rights by remaining in the house, absent a court order or exigent circumstances."); <u>Painter</u>, 185 F.3d at 567 ("Th[e] search should have terminated instantly upon Painter's revocation of consent, and the officers should have promptly departed the premises (assuming they possessed no independent legal authority to remain)."); see also <u>West</u>, 219 F.3d at 1178 (noting that it was unnecessary to decide when the defendant revoked consent because the officer had earlier established probable cause).

Higdon advances two justifications for his continued detention of Manzanares:  (1) investigative detention of Manzanares was supported by reasonable suspicion that he was obstructing an officer and (2) detention of Manzanares as a witness was permissible.  We address each proffered justification.

**1**

"[L]abeling an encounter in the home as either an investigatory stop or an arrest is meaningless because <u>Payton</u>'s requirements apply to all [such] seizures."

United States v. Reeves, 524 F.3d 1161, 1166 (10th Cir. 2008). That is because "at the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Payton, 445 U.S. at 589-90 (alteration omitted). Thus, Higdon's attempt to label the encounter an "investigative detention" is of no consequence. Reeves, 524 F.3d at 1166; see Payton, 445 U.S. at 590 ("In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."). Our inquiry begins with whether the officers had probable cause as Payton requires. 445 U.S. at 590.

Before this court, Higdon argues that he reasonably suspected Manzanares was obstructing an officer. Although he argues under the incorrect standard, we consider his position under the proper standard as a possible alternative ground for affirmance.[7]

"Probable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be [seized] has committed or is about to commit a crime." Cortez, 478 F.3d at 1116; see also York v. City of Las Cruces, 523 F.3d 1205,

_____

[7] Higdon made this argument below in passing, asserting that he had "reasonable suspicion and probable cause to believe [Manzanares] was committing or had committed the offense of obstructing an officer under state statute or city ordinance." (Emphasis added).

1210 (10th Cir. 2008). We consider information relayed by one officer to another, but such information must be based on personal knowledge. See Fogarty v. Gallegos, 523 F.3d 1147, 1157 n.10 (10th Cir. 2008). Neither the officer's subjective beliefs nor information gleaned post-hoc bear on this inquiry. Buck v. City of Albuquerque, 549 F.3d 1269, 1281-82 (10th Cir. 2008).

Considering the facts known to Officer Higdon, we conclude that he could not have reasonably believed that Manzanares had resisted, evaded, obstructed, or refused to obey an officer within the meaning of either of the relevant provisions of New Mexico law. See N.M. Stat. § 30-22-1 (resisting, evading, or obstructing an officer); Albuquerque, N.M., Revised Ordinances § 12-2-19(D) (resisting, obstructing, or refusing to obey an officer). At the time Manzanares asked him to leave, Higdon knew only that Manzanares was a co-worker and friend of Maestas and that Manzanares and Maestas had socialized together earlier that night. Higdon testified that both he and Officer Morales believed Manzanares "knew more than he was willing to say," but that conjecture was not anchored in any factual observation.

An officer in Higdon's position would not reasonably believe that Manzanares was resisting or obstructing an officer under New Mexico law. New Mexico Statute § 30-22-1(D) provides that "resisting, evading or obstructing an officer" consists of "resisting or abusing any judge, magistrate or peace officer in the lawful discharge of his duties." Albuquerque has a city ordinance that

prohibits "resisting, obstructing or refusing to obey an officer," with language similar to the state statute on "[i]nterfering with, obstructing or opposing any officer in the lawful discharge of his regular and affixed duties." Albuquerque, N.M., Revised Ordinances § 12-2-19(D). Higdon's sole basis for guessing that Manzanares was violating either provision was the pure speculation that Manzanares could have been more cooperative and shared more information.[8] An unsubstantiated hunch cannot constitute probable cause. Cortez, 478 F.3d at 1114 n.4, 1116. Thus, Higdon did not have probable cause to believe that Manzanares had violated either of the relevant provisions.[9]

---

[8] When asked on cross-examination whether he "w[as] obstructing the police investigation," Manzanares answered, "I guess in a small way." On redirect examination, however, Manzanares said that he did not know the legal definition of obstruction, testified that he never physically impeded the investigation, and said that he only "obstructed" the investigation by not disclosing information. Higdon acknowledged on cross that Manzanares did not physically resist, fight, or spit on an officer.

[9] At trial, Higdon obtained jury instructions regarding accessory in the commission of a crime, see N.M. Stat. § 30-1-13, and aiding a felon to avoid arrest, see N.M. Stat. § 30-22-4. Higdon lacked probable cause for these crimes as well. New Mexico's accessory statute requires that Manzanares "helped, encouraged, or caused the [sexual assault] to be committed" and that "[Manzanares] intended that the [sexual assault] be committed." State v. Johnson, 98 P.3d 998, 1007 (N.M. 2004). That Manzanares socialized with Maestas the night of the alleged assault could not have supplied the requisite probable cause to believe that Manzanares "helped, encouraged, or caused" a rape or that he intended for a rape to occur. See Ybarra v. Illinois, 444 U.S. 85, 91 (1979).

Similarly, aiding a felon requires that Manzanares "knew that the alleged felon had committed a felony and . . . had the intent that the alleged felon escape or avoid arrest, trial, conviction or punishment." State v. Gardner, 814 P.2d 458,

(continued...)

- 13 -

**2**

Higdon also claims that he could detain Manzanares as a witness to prevent him from alerting Maestas.  Two distinct legal theories are entwined in this justification:  (1) detention of a witness for information, see Illinois v. Lidster, 540 U.S. 419 (2004), and (2) prevention of interference in an ongoing investigation.  Neither theory permitted Higdon to remain in the Manzanares home.

Witness detentions are confined to the type of brief stops that "interfere[] only minimally with liberty."  Id. at 427.  Neither the Supreme Court nor this court has countenanced such a detention in a home.  See Reeves, 524 F.3d at 1166.  In Lidster, the Court explicitly distinguished the circumstances of that case—a traffic checkpoint—from situations, such as the one here, in which "a presumptive rule of unconstitutionality" applies.  540 U.S. at 426.  In the absence of this presumption, Lidster employed ad hoc balancing of public concern and intrusiveness of the stop.  Id. at 427.  While such balancing may obviate the probable cause requirement in certain brief public encounters, in the home, probable cause remains a categorical requirement.  See Randolph, 547 U.S. at

---

[9](...continued)
461 (N.M. Ct. App. 1991).  By Higdon's own testimony, his only basis to suspect anything along these lines was his hunch that Manzanares "knew more than he was willing to say."  He had no objective basis for that belief, let alone for the belief that Manzanares knew Maestas had committed a felony and that he intended to help Maestas escape arrest.  Accordingly, no reasonable jury could have found for Higdon on the basis of either of these statutes.

115. Because the detention here occurred inside a home, it was unquestionably unconstitutional unless supported by probable cause. Reeves, 524 F.3d at 1166. As explained above, this seizure was not supported by probable cause.

As to Higdon's protection-of-investigation rationale, we must consider whether Higdon had probable cause to believe that Manzanares was about to commit the crime of obstruction. As discussed above, Higdon's only objective reasons for suspicion were that Manzanares and Maestas were friends and co-workers who had spent time together earlier that evening. These facts fall well short of supplying probable cause.

Further, to the extent that Higdon's argument can be read as seeking an exception to the Fourth Amendment's strictures on seizures in the home, we decline his invitation. We will not lower the drawbridge to invite police into a home without a warrant or an established substitute therefor whenever officers "feel" that a resident might impede an ongoing investigation. Such an exception would stand the Fourth Amendment on its head. See Randolph, 547 U.S. at 109 (exceptions to the warrant requirement must be "jealously and carefully drawn" (quoting Jones, 357 U.S. at 499)).

We accordingly reject both of Higdon's purported justifications for remaining in the Manzanares home. Given the absence of probable cause, Higdon was constitutionally compelled to leave the home when Manzanares withdrew consent. Thus, a reasonable jury was compelled to find that Manzanares'

constitutional rights were violated when Higdon remained in his home without a warrant or valid exception to the warrant requirement after consent was revoked.

**B**

Having concluded that Higdon violated the Fourth Amendment by refusing to exit, we must determine whether his conduct was objectively reasonable in light of clearly established law at the time it occurred.[10] Weigel, 544 F.3d at 1151. Officers are immune from suit unless the contours of the right in question are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quotation omitted). This is an objective legal question. Keylon v. City of Albuquerque, 535 F.3d 1210, 1218 (10th Cir. 2008).

It has been clear for nearly thirty years that a warrantless entry into a home is presumptively unreasonable. Payton, 445 U.S. at 585-86. The Supreme Court has consistently reiterated the famous refrain that a man's home is his castle and has preserved the home as the center of the Fourth Amendment's protections. See

---

[10] Although the district court did not reach this issue, it is a purely legal determination that was argued below and that we may decide on the record. See Gomes v. Wood, 451 F.3d 1122, 1133, 1136 (10th Cir. 2006); cf. United States v. Ozbirn, 189 F.3d 1194, 1199 n.3 (10th Cir. 1999) ("[R]emand for further proceedings is unnecessary because no additional fact-finding is needed to resolve the ultimate legal issues involved"). Moreover, the parties briefed this issue, providing us the benefit of the adversarial process. Pittsburg & Midway Coal Mining Co. v. Watchman, 52 F.3d 1531, 1539 (10th Cir. 1995), abrogated on other grounds as recognized by United States v. Arrieta, 436 F.3d 1246, 1250 n.2 (10th Cir. 2006).

Randolph, 547 U.S. at 115; Payton, 445 U.S. at 601 n.54; Olmstead v. United States, 277 U.S. 438, 463 (1928); Burdeau v. McDowell, 256 U.S. 465, 475 (1921); Weeks v. United States, 232 U.S. 383, 394 (1914), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643 (1961). Similarly, the Court has clearly established that the scope of a consensual encounter is controlled by the consenting person. Jimeno, 500 U.S. at 251. Thus, an objectively reasonable officer would have known that Higdon's continued presence in the Manzanares home became a seizure when Manzanares withdrew his consent. See Gates, 537 F.3d at 426; West, 219 F.3d at 1178; Painter, 185 F.3d at 567.

Any reasonable officer would also have known that probable cause was indispensable to justify remaining in the Manzanares home. The Court made clear in Payton that, at a bare minimum, all in-home seizures require the existence of probable cause. Reeves, 524 F.3d at 1166. Similarly, there can be no reasonable dispute that probable requires "reasonably trustworthy information," Hunter v. Bryant, 502 U.S. 224, 228 (1991), or that an inchoate hunch does not satisfy this standard, see Cortez, 478 F.3d at 1114-16 & n.4. By his own admission, Higdon's beliefs that Manzanares was committing or was about to commit a crime were based on the mere speculation that he "knew more than he was willing to say."

That Higdon could not remain in a home to detain a witness who might impede an investigation if freed was similarly clearly established. Higdon's

- 17 -

argument that <u>Walker v. City of Orem</u>, 451 F.3d 1139 (10th Cir. 2006), holds otherwise is a non-starter. <u>Walker</u> addressed a situation in which officers required individuals known to be witnesses to remain in their home. <u>Id.</u> at 1144-45. Although the court held the detention unconstitutional, <u>id.</u> at 1150, it held also that the contours of witness detention were not clearly established at the time, <u>id.</u> at 1151.

Our present case differs in several fundamental respects. First, Manzanares was not a "witness" in any traditional sense. In contrast to the officers in <u>Walker</u>, Higdon had no reason to believe that Manzanares observed the alleged crime. Second, while the witnesses in <u>Walker</u> were in their home, the officers detaining them were not. <u>Id.</u> at 1145. Higdon, however, remained in the Manzanares home. This distinction places Higdon on entirely different footing than the officers in <u>Walker</u> and squarely within a clearly established line of cases. <u>See</u> <u>Payton</u>, 445 U.S. at 585-86; <u>Reeves</u>, 524 F.3d at 1166.

These cases unanimously require probable cause (as well as a warrant or exigent circumstances) to seize an individual in his home. <u>See</u> <u>Groh</u>, 540 U.S. at 559. "Because not a word in any of our cases would suggest to a reasonable officer that this case fits within any exception to that fundamental tenet, [Higdon] is asking us, in effect, to craft a new exception. Absent any support for such an exception in our cases, he cannot reasonably have relied on an expectation that we would do so." <u>Id.</u> at 565. Accordingly, we conclude that Higdon violated

Manzanares' clearly established constitutional rights by remaining in his home after consent was withdrawn without probable cause.

## III

## A

We proceed to consider whether Higdon unlawfully detained Manzanares in the squad car after Manzanares agreed to help APD officers locate Maestas' home. Higdon acknowledges that holding Manzanares in the car constituted a seizure. Because this detention occurred outside the home, we must decide whether this seizure constituted an arrest or an investigative detention in order to ascertain Fourth Amendment requirements.[11] See United States v. Brown, 496 F.3d 1070, 1074 (10th Cir. 2007). An investigative detention is

> a seizure within the meaning of the Fourth Amendment but, unlike an arrest, it need not be supported by probable cause. . . . An officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause.

Cortez, 478 F.3d at 1115 (quotations omitted). An investigative detention evolves into an arrest when the scope of police conduct is no longer reasonably related to the circumstances initially justifying the seizure. United States v. Melendez-

---

[11] Higdon does not argue that because Manzanares agreed to show police the location of the Maestas home, Manzanares' presence in the squad car was consensual at the outset. Presumably, this is because such agreement may well have been the product of involuntary consent deriving from the unconstitutional seizure in the Manzanares home. See United States v. Chavez, 534 F.3d 1338, 1348 n.14 (10th Cir. 2008).

Garcia, 28 F.3d 1046, 1051 (10th Cir. 1994). "An arrest is distinguished by the involuntary, highly intrusive nature of the encounter." Cortez, 478 F.3d at 1115 (quotation omitted).

"The allowable scope of an investigative detention cannot be determined by reference to a bright line rule." United States v. Neff, 300 F.3d 1217, 1220 (10th Cir. 2002); accord United States v. Sharpe, 470 U.S. 675, 685 (1985). Although there is no rigid time limit on an investigative detention, "it is clear that the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." Sharpe, 470 U.S. at 685 (quotation omitted). The Supreme Court has "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." Id. (citation omitted). Forceful methods may be used during an investigative detention short of arrest only when such methods are necessary for officer protection. Neff, 300 F.3d at 1220. "The use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest." Cortez, 478 F.3d at 1115-16 (quoting Melendez-Garcia, 28 F.3d at 1052) (quotation marks omitted).

As the Supreme Court has noted, it has never held a detention of 90 minutes or longer to be anything short of an arrest. United States v. Place, 462

- 20 -

U.S. 696, 709-710 (1983). Higdon points us to no case, and our independent research reveals none, construing a detention of 90 minutes or longer as an investigative detention.[12] See, e.g., Walker, 451 F.3d at 1150 (90 minute detention constituted an arrest); United States v. Edwards, 103 F.3d 90, 93 (10th Cir. 1996) (45 minute detention constituted an arrest); United States v. Shareef, 100 F.3d 1491, 1501-02 (10th Cir. 1996) (30 and 45 minute detentions did not constitute arrests).

Viewing the facts in Higdon's favor, i.e., minimizing the length of the detention, Manzanares was held in the back of the squad car for more than three hours—more than twice as long as the reference point established by the Supreme Court in Place. The duration of detention alone provides strong evidence that Manzanares was under arrest rather than merely subject to an investigative detention.

Moreover, Manzanares was handcuffed and locked in a confined space for the entirety of the detention. The record does not provide a particularized reason to suspect he was dangerous so as to justify such forceful measures. See Neff, 300 F.3d at 1220. Higdon argues that APD standard procedure calls for handcuffing those who ride in the back of squad cars, but police policy cannot

---

[12] Cases such as Illinois v. McArthur, 531 U.S. 326 (2001), and United States v. Cantu, 405 F.3d 1173 (10th Cir. 2005), present a different issue—permissible detention while obtaining a search warrant relating to the detained individual—and thus have no relevance here.

control our analysis of Higdon's liability for a constitutional violation. Cf. Anaya v. Crossroads Managed Care Sys., Inc., 195 F.3d 584, 592 (10th Cir. 1999).

Higdon claims that the detention did not become an arrest because "actions were being taken" for the duration of Manzanares' detention, apparently referring to the fact that Maestas had yet to be apprehended. Enmeshed in this argument is the notion that Manzanares might have alerted Maestas to the police investigation if freed. Considering the purpose of a detention is appropriate in determining whether it was an arrest. Sharpe, 470 U.S. at 685. We have also recognized that brief detention of witnesses may be permissible if reasonable. Walker, 451 F.3d at 1148 (citing Lidster, 540 U.S. at 426-27). Reasonableness in the witness detention context requires us to balance "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Brown v. Texas, 443 U.S. 47, 51 (1979).

In weighing these factors, we begin by noting that "police have less authority to detain those who have witnessed a crime for investigatory purposes than to detain criminal suspects." Walker, 451 F.3d at 1148. We further recall that Higdon did not have a reasonable basis to believe Manzanares had witnessed the alleged crime. Rather, Manzanares knew only identifying information about the suspect, which he had already shared with police. This case does not require us to delineate the precise definition of "witness" or address the impact of a

detained individual's quantum of knowledge on the arrest analysis. Manzanares' detention in the squad car was so far beyond any conceivable line delineating the scope of a non-arrest detention that his knowledge is essentially irrelevant.

Once Manzanares led Higdon to Maestas' residence, the purpose of the detention was satisfied. At least under the facts of this case, the mere possibility that Manzanares might have tipped off Maestas cannot transform a forceful, three-hour detention from an arrest into something less. A contrary holding would marginalize established precedent holding that investigative and witness detentions are brief and carefully limited in scope. See Lidster, 540 U.S. at 427-28 (collecting cases); Cortez, 478 F.3d at 1115 ("An officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." (emphasis added and quotation omitted)). We cannot permit law enforcement to detain individuals in police vehicles indefinitely absent probable cause without eviscerating these long-standing constitutional requirements. Thus, based both on the duration of the detention and the use of forceful measures, we hold that Manzanares was arrested when he was handcuffed and confined in the back of a squad car for more than three hours.

Higdon does not identify any basis for this arrest other than the factors he advanced in support of Manzanares' in-home detention, and we discern none in the record. As explained above, these factors do not establish probable cause,

see Part II.A.1, supra, as required for an arrest, Michigan v. Summers, 452 U.S. 692, 700 (1981).  Thus, we conclude that Manzanares was arrested without probable cause in violation of the Fourth Amendment.  Given that we reach this conclusion viewing the record in the light most favorable to Higdon, no reasonable jury could have concluded otherwise.

**B**

Lastly, we consider whether Manzanares' squad car detention violated clearly established law.  Whether an investigative detention has evolved into an arrest is always a case-specific inquiry, but it has been clear for some time that the use of handcuffs generally converts a detention into an arrest.  See Melendez-Garcia, 28 F.3d at 1052.  We have also clearly required a particularized suspicion that a detainee is dangerous in order to justify handcuffs or other forceful techniques in an investigative detention.  See id. at 1052-53 (mere suspicion that suspects possess drugs insufficient to justify use of handcuffs and display of firearms); United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993) (police use of firearms did not turn an investigative detention into an arrest when the officers knew that guns were found on the premises).

Based on these cases, any reasonable officer would understand that it is unconstitutional to handcuff someone absent probable cause or an articulable basis to suspect a threat to officer safety combined with reasonable suspicion.  Moreover, Higdon's suggestion that an ongoing investigation provides blanket

- 24 -

license for investigative detention is a novel one wholly without support in our case law. Accordingly, this theory cannot call into question our clearly-established law on point. See Groh, 540 U.S. at 565 ("Absent any support for such an exception in our cases, he cannot reasonably have relied on an expectation that we would [create one].").

As with Manzanares' in-home detention, Higdon argues that Walker is dispositive of the clearly established inquiry. We are unpersuaded. He is correct that Walker reiterates the absence of a bright-line delineation between arrest and mere detention. 451 F.3d at 1149. Yet, Walker does not control this case both because the detention here lasted more than twice as long as that in Walker and because Manzanares, unlike the plaintiffs in Walker, was not reasonably believed to have witnessed a crime. Id. at 1145, 1147-48. Higdon cannot escape liability by labeling Manzanares a "witness."

Moreover, we cannot accept Higdon's broader proposition that the existence of a grey area between arrests and investigative detentions means that no reasonable officer can ever understand that he has arrested a suspect. Although the lack of bright-line rule may merit somewhat greater leeway in determining whether the law on a particular point is clearly established, Higdon's argument ignores that precedent creates meaningful standards even when it does not draw bright lines. See, e.g., Buck, 549 F.3d at 1290-91; Weigel, 544 F.3d at 1153-55. No reasonable officer could divine from our precedent the notion that a

three-hour, handcuffed detention without any basis for the use of force was anything short of an arrest.  We further conclude that a reasonable officer could not have believed that there was probable cause to arrest to Manzanares, see Part II.B, supra, as required by clearly established law, Summers, 452 U.S. at 700. Thus, Higdon violated Manzanares' clearly established constitutional rights when he handcuffed and detained Manzanares in a squad car for more than three hours.[13]

## IV

For the foregoing reasons, we **REVERSE** the judgment below and **REMAND** with instructions that the district court enter judgment as a matter of law in favor of Manzanares on his Fourth Amendment claims and hold a new trial on damages.

---

[13] Because we reverse the judgment below and remand for entry of judgment as a matter of law on both claims, a new trial will be held on damages but not on liability.  Thus, we need not determine whether the jury was properly instructed as to liability.