FILED
United States Court of Appeals
Tenth Circuit

July 17, 2020

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ANTHONY MARTINEZ,

    Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,

    Defendant - Appellee.

No. 19-1140
(D.C. No. 1:15-CV-01993-RPM)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **MATHESON**, and **CARSON**, Circuit Judges.
_____

Plaintiff-Appellant Anthony Martinez sued the United States under the Federal

Tort Claims Act ("FTCA") after a police officer shot him. He alleged three Southern Ute

Police Department ("SUPD") officers—Cheryl Herrera, Matthew Mitchell, and Patrick

Backer (the "Officers")—negligently intruded onto his property late at night without

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

identifying themselves.[1]  The district court held a bench trial and found for the United States.  Mr. Martinez appealed, challenging the district court's negligence analysis.

After oral argument, we ordered the parties to submit supplemental briefs to address whether the district court lacked subject matter jurisdiction under the FTCA because the United States retained sovereign immunity under the discretionary function exception.  *See* 28 U.S.C. § 2680(a).[2]

---

[1] The Indian Self-Determination and Education Assistance Act ("ISDEA") allows the United States to contract with Native American tribes to provide law enforcement funding.  Under such contracts, "an Indian tribe . . . and its employees are deemed employees of the [United States] while acting within the scope of their employment in carrying out the contract or agreement."  Department of the Interior and Related Agencies Appropriation Act, 1991, Pub. L. No. 101-512, 104 Stat. 1915, 1960 (codified in 25 U.S.C. § 5301 *et seq*.).  Certain civil claims against law enforcement officers carrying out their duties under such contracts are thus "afforded the full protection and coverage of the [FTCA]."  *Id.*

The Department of Interior's Bureau of Indian Affairs ("BIA") funds the SUPD under a contract with the Southern Ute Tribe.  Under the contract, SUPD officers are considered federal employees for the purposes of the FTCA.  *See* Dist. Ct. Doc. 23 at 6 (determining that the Officers "were acting within the scope of the [contract] and are deemed BIA employees entitled to the protection of the FTCA for those torts covered by the Act"); Dist. Ct. Doc. 13-4 (providing the relevant page of the contract).

[2] We "have an independent obligation" to determine whether we have subject matter jurisdiction under the FTCA.  *Garling v. U.S. EPA*, 849 F.3d 1289, 1293 (10th Cir. 2017) (citation omitted).  "Consequently, even if the government failed properly to raise and preserve the discretionary function defense . . . we nonetheless are bound to consider it."  *Irving v. United States*, 162 F.3d 154, 160 (1st Cir. 1998).

The United States asserts that we need not address subject matter jurisdiction under the FTCA because, in *Cox v. United States*, 881 F.2d 893, 894 n.1 (10th Cir. 1989), we declined to decide a discretionary function exception issue that was not raised on appeal.  Aplee. Suppl. Br. at 2.  But in *Cox*, we held that the district court lacked subject matter jurisdiction under 28 U.S.C. § 1346(b)(1), another provision of the FTCA.  881 F.2d at 894-95.  There was no reason to consider whether the discretionary function exception also deprived the court of jurisdiction.

After reviewing the supplemental briefs and the record, we conclude the discretionary function exception applies and the district court lacked subject matter jurisdiction over the negligence claim. We remand with instructions to dismiss the negligence claim.

## I. BACKGROUND

In determining whether the United States retains sovereign immunity under the discretionary function exception, we "consider[] the allegations in the complaint as well as the evidence in the record." *Garcia v. U.S. Air Force*, 533 F.3d 1170, 1175 (10th Cir. 2008).

### A. *Factual Background*

#### 1. The Fight

Mr. Martinez hosted a social gathering at his father's house. Andrew Rossi and his girlfriend, Bridget Weaver, and Luana Price and her boyfriend, Fabian Pena, were guests.

A fight began when Mr. Rossi hit Ms. Weaver and Mr. Pena intervened. Mr. Martinez forced Mr. Rossi and Mr. Pena outside, where the fight ended. Ms. Weaver, Mr. Pena, and Ms. Price left the gathering. Mr. Rossi remained.

Around 1:00 a.m., Mr. Pena returned with Ms. Price and her two brothers. After they threatened Mr. Rossi, Mr. Martinez punched one of the Price brothers. A brawl ensued, and Mr. Martinez told Mr. Rossi they should "go get the bats." App. at 105. The Price brothers, Mr. Pena, and Ms. Price left.

3

### 2. First Police Response

One of the Price brothers called the police. Officer Herrera met them at an intersection near Mr. Martinez's house. Officers Mitchell and Backer arrived as backup.

Officer Mitchell and a fourth officer went to Mr. Martinez's house to investigate what had happened. They parked in front, walked to the door, and announced themselves as police. Nobody answered. Officer Mitchell looked in a side window and saw Mr. Rossi in the house. He reported to Officers Backer and Herrera and then returned to regular duty.

### 3. Second Police Response

Officer Herrera met with a deputy from the county sheriff's office and learned that Ms. Weaver might have returned to Mr. Martinez's house after the fight. *Id.* at 990-92. In response, Officers Herrera and Backer returned to Mr. Martinez's house around 3:30 a.m. to look for Ms. Weaver and check on her welfare. *Id.* at 415, 534, 993. As they neared the house, they "saw a vehicle that looked like [Ms.] Weaver's car . . . in the driveway." *Id.* at 993-94.

Officer Herrera, who was in charge, decided to approach the house using a stealth tactic called a "blackout," whereby police keep quiet, wear dark clothing, and park out of sight. *Id.* at 410, 416-17, 994, 1050-51, 1059-61. The method is employed to protect officers from attack from inside the house. In domestic violence cases, it also is used to prevent perpetrators from injuring victims or attempting to silence them as police near.

4

Officer Mitchell arrived as backup. He drove past the house in his patrol car and saw two people in the yard look at him and go inside. He assumed they recognized him as a police officer, and he expected no response because Mr. Martinez had ignored the police earlier.

Mr. Martinez thought the Officers' car was the Price brothers' SUV, which looked similar. Believing the brothers had returned to resume the fight, Mr. Martinez got a baseball bat from inside and hid behind a bush near where his driveway met the road.

### 4. The Shooting

The Officers walked quietly toward the house without using flashlights. Officers Herrera and Backer wore standard-issue black police jackets with the SUPD logo on the shoulders, but no police identification on the front. *Id.* at 308-09, 1284-86. Officer Mitchell, wearing his standard gray police shirt and no jacket, walked behind Officers Herrera and Backer.

The Officers heard the bush rustling and shined a flashlight. Mr. Martinez jumped out and ran toward them, raised the bat above his head, and shouted. The Officers drew their guns, and Officer Backer shot Mr. Martinez.

### B. *Procedural Background*

### 1. The Complaint and Pretrial Rulings

Mr. Martinez sued the Officers under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging excessive force and malicious prosecution. He sued the United States under the FTCA, alleging intentional

5

torts and negligence under Colorado law. The district court dismissed the intentional tort claims under 28 U.S.C. § 2680(h), which exempts certain torts from the FTCA's waiver of sovereign immunity.

The court later granted summary judgment to the Officers on the *Bivens* excessive force claim, holding they were entitled to qualified immunity. Although it found there was "conflicting evidence regarding the reasonableness of the officers' conduct," Dist. Ct. Doc. 87 at 5, the court concluded they did not violate clearly established law by shooting Mr. Martinez. The parties agreed to a dismissal of the *Bivens* malicious prosecution claim. Only the FTCA negligence claim against the United States remained for trial.

## 2. Bench Trial

After a six-day bench trial on the negligence claim, the district court ruled for the United States, finding that even if the Officers were negligent, they did not proximately cause Mr. Martinez's injuries because Mr. Martinez's ambush with the bat was a superseding cause. Alternatively, it found Mr. Martinez's negligence accounted for more than 50 percent of the fault, barring recovery under Colorado's comparative negligence statute. Mr. Martinez timely appealed, challenging only the district court's disposition of the FTCA negligence claim.

## 3. Supplemental Briefing on Jurisdiction

At oral argument, we asked the parties whether the Officers' decision to use the blackout approach was "a discretionary function" under 28 U.S.C. § 2680(a) and thus

6

exempt from the FTCA's waiver of sovereign immunity. Because neither the district court nor the parties had raised the issue or prepared to discuss it at oral argument, we requested supplemental briefs addressing the discretionary function exception and its effect on subject matter jurisdiction. The parties submitted supplemental briefs simultaneously.

## II. **DISCUSSION**

The district court lacked jurisdiction over Mr. Martinez's negligence claim because the discretionary function exception to the FTCA's waiver of sovereign immunity applies. First, the Officers exercised discretion in choosing how to approach Mr. Martinez's house, and no statute, regulation, or policy prohibited their choice or required a different one. Nor has Mr. Martinez shown their actions violated the Fourth Amendment. Second, the decision to use the blackout approach was susceptible to public policy concerns regarding safety and effectiveness.

### A. *Legal Background*

"The concept of sovereign immunity means that the United States cannot be sued without its consent." *Iowa Tribe of Kan. & Neb. v. Salazar*, 607 F.3d 1225, 1232 (10th Cir. 2010) (quotations omitted). The FTCA provides "a limited waiver of [the United States'] sovereign immunity . . . for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813 (1976); *see* 28 U.S.C. § 1346(b)(1). It includes exceptions to this limited waiver. *See* 28 U.S.C.

7

§ 2680. "When an exception applies, sovereign immunity remains, and federal courts lack jurisdiction." *Garling v. U.S. EPA*, 849 F.3d 1289, 1294 (10th Cir. 2017).

Under the FTCA's discretionary function exception, the United States does not waive its immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). "[T]he purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (quotations omitted). When determining whether government conduct falls within the discretionary function exception, courts apply the two-part test set forth in *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988). *See Garling*, 849 F.3d at 1295.

First, courts determine whether the conduct was "discretionary"—that is, whether it was "a matter of choice for the acting employee." *Berkovitz*, 486 U.S. at 536. Conduct is not discretionary if it "violate[s] a federal statute, regulation, or policy that is both specific and mandatory." *Elder v. United States*, 312 F.3d 1172, 1177 (10th Cir. 2002) (quotations omitted). Most circuits also have held conduct is not discretionary when it "exceeds constitutional bounds." *Loumiet v. United States*, 828 F.3d 935, 944 (D.C. Cir. 2016) (collecting cases); *see, e.g.*, *Medina v. United States*, 259 F.3d 220, 225 (4th Cir.

8

2001) (explaining that "[f]ederal officials do not possess discretion to violate constitutional rights" (quotations omitted)).[3]

Second, if the conduct was discretionary, courts determine whether it was "based on considerations of public policy." *Berkovitz*, 486 U.S. at 537. They "ask[] categorically (rather than case specifically) whether the kind of conduct at issue can be based on policy concerns." *Sydnes v. United States*, 523 F.3d 1179, 1185 (10th Cir. 2008). Courts "do not consider the employee's 'subjective intent in exercising the discretion . . . , but on[ly] the nature of the actions taken and . . . whether they are susceptible to policy analysis.'" *Garcia*, 533 F.3d at 1176 (quoting *Gaubert*, 499 U.S. at 325). "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.

If both parts of the *Berkovitz* test are met, the discretionary function exception applies, "the United States retains its sovereign immunity[,] and the district court lacks subject matter jurisdiction to hear the suit." *Garcia*, 533 F.3d at 1175-76. "Because the

---

[3] *See also Limone v. United States*, 579 F.3d 79, 102 (1st Cir. 2009); *Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975); *U.S. Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988); *Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir. 1987); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003); *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000). *But see Kiiskila v. United States*, 466 F.2d 626, 627-28 (7th Cir. 1972) (concluding the discretionary function exception applied to government conduct that was "constitutionally repugnant" and in violation of the First Amendment).

discretionary function exception is jurisdictional, the burden is on [the plaintiff] to prove that it does not apply." *Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216, 1220 (10th Cir. 2016); *accord Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998) ("The discretionary function exception poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction." (quotations omitted)).  If the plaintiff fails to make the necessary showing under *Berkovitz*, "[t]he [discretionary function] exception applies even if the governmental employees were negligent." *Aragon*, 146 F.3d at 822.

## B. *Analysis*

We first determine whether use of the blackout approach was within the Officers' discretion.  Finding that it was, we then assess whether their conduct was based on public policy concerns.

### 1. **Discretion**

Mr. Martinez argues the Officers lacked discretion to use the blackout approach because it violated (1) the BIA Office of Justice Services Law Enforcement Handbook ("BIA Handbook"),[4] and (2) the Fourth Amendment.  But he has not shown that the Officers "violated a federal statute, regulation, or policy" by using the blackout approach,

---

[4] The BIA Handbook contains a set of policies that federally recognized tribes may adopt.  The SUPD has adopted the Handbook.

*Elder*, 312 F.3d at 1177, or that the approach "exceed[ed] constitutional bounds,"

*Loumiet*, 828 F.3d at 944.  Their conduct was therefore discretionary.

      a.  *BIA Handbook*

      The BIA Handbook does not address the blackout approach.  Mr. Martinez

acknowledges that "[t]here are no official BIA or SUPD policies, procedures, or other

guidelines regarding the blackout approach.  Use of the blackout approach is left to

officer discretion . . . ."  Aplt. Br. at 5 (citing App. at 163-64).

      Even so, Mr. Martinez argues the Officers violated the following provisions of the

BIA Handbook when they used the blackout approach:

> (1) "All commissioned police officers will wear the approved and
> issued police uniform when on duty," App. at 1305;
>
> (2) "Officers not in uniform will fully identify themselves as
> officers and exhibit their badges or credentials prior to
> initiating any field interview," *id.* at 1307; and
>
> (3) When "initiat[ing] a contact" with the public, officers must
> "identify themselves as law enforcement officers as soon as
> possible if it is not evident," and must avoid "force or
> coercion," *id.* at 1306.

Mr. Martinez argues that these policies prohibited the Officers from using the blackout

approach.  We disagree because the Officers did not violate these provisions.

      First, Officers Herrera and Backer wore standard-issue police jackets that were

part of their uniforms.  App. at 305-06, 382, 510, 1093.  Officer Mitchell wore his

standard gray police uniform without a jacket.  *Id.* at 219.  They did not, therefore, violate

the BIA requirement that "police officers will wear the approved and issued police

11

uniform," App. at 1305, nor the provision pertaining to "[o]fficers not in uniform," *id.* at 1307.

Second, although the Officers did not identify themselves as police as they approached the property, they did not "initiate a contact" with Mr. Martinez. *Id.* at 1306. He did when he ran out from behind a bush waving a bat and yelling. Officer Herrera testified that, had she been able to initiate contact with Mr. Martinez, she had "[no] intention of concealing [her] identity as a police officer." *Id.* at 995. Officers Mitchell and Backer gave similar testimony. *See id.* at 323-24, 415-16. The Officers did not, therefore, violate the provision that they identify themselves as police and avoid force or coercion when "initiat[ing] a contact" with the public. *Id.* at 1306.

Third, the trial testimony supports that the BIA Handbook allowed the blackout approach. BIA Chief of Police, John Roberts Burge, testified that the Officers' approach was consistent with the Handbook. *Id.* at 1116-18. Officer Mitchell also noted that police field training teaches the blackout approach and instructs officers to use the approach "depend[ing] on the nature of the contact and prior history with the residence itself and also the people that [the officers are] attempting to contact." *Id.* at 281. The SUPD teaches officers that use of the approach is "situationally dependent." *Id.* at 785.[5]

---

[5] Although Officer Mitchell said during cross examination at trial that some of the BIA Handbook's provisions seem inconsistent with the blackout approach, App. at 381-84, our analysis above shows those sections do not prohibit the blackout approach.

In short, Mr. Martinez has not shown that the Officers' use of the blackout approach violated a "specifically prescribe[d] . . . course of action" in the BIA Handbook. *Garling*, 849 F.3d at 1295 (quotations omitted).

b. *Fourth Amendment*

Mr. Martinez argues the blackout approach violated his Fourth Amendment rights and therefore was not discretionary. He relies on *Florida v. Jardines*, 569 U.S. 1, 6 (2013), *Kentucky v. King*, 563 U.S. 452, 469-470 (2011), and *Manzanares v. Higdon*, 575 F.3d 1135, 1146 (10th Cir. 2009), to argue that "[a] homeowner has a clear Fourth Amendment right to choose not to speak with officers who may appear at his home without a warrant." Aplt. Suppl. Br. at 5-6.[6] He contends the Officers violated that right by approaching the house in a clandestine manner despite his failure to answer the door for Officer Mitchell earlier that night. Although, as noted above, most circuits have held that conduct is not discretionary under the FTCA when it violates the Constitution, this circuit has not addressed this issue. We need not do so here because, as explained below, Mr. Martinez's arguments for a Fourth Amendment violation are not persuasive.

---

[6] In *Jardines*, the Supreme Court said that police officers may knock on a front door, but that using a drug-sniffing dog on a home's curtilage is a search under the Fourth Amendment. 569 U.S. at 11-12. In *King*, the Court stated that when police knock on a door, "the occupant has no obligation to open the door or to speak." 563 U.S. at 469-70. In *Manzanares*, we held that an officer violated a homeowner's Fourth Amendment rights because he "remained in [the] home without a warrant or valid exception to the warrant requirement" after the homeowner "unequivocally asked [him] to leave." 575 F.3d at 1143, 1146.

13

i. Additional legal background

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "Houses, for Fourth Amendment purposes, include a home's curtilage . . . ." *United States v. Carloss*, 818 F.3d 988, 992 (10th Cir. 2016) (quotations omitted).

Even without a warrant or reasonable suspicion, "a police officer, like any member of the public, has an implied license to enter a home's curtilage to knock on the front door, seeking to speak with the home's occupants." *Id.*; *accord United States v. Shuck*, 713 F.3d 563, 567 (10th Cir. 2013) ("[A] 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion." (quotations omitted)).

A knock and talk becomes a nonconsensual seizure when occupants reasonably believe they cannot refuse to speak with the police—that is, when the encounter becomes "coercive." *United States v. Reeves*, 524 F.3d 1161, 1167 (10th Cir. 2008); *compare id.* at 1168-69 (holding that officers seized a homeowner when they pounded on his door and windows and yelled for 20 minutes between 2:30 a.m. and 3:00 a.m.) *with United States v. Hernandez-Chaparro*, 357 F. App'x 165, 167 (10th Cir. 2009) (unpublished) (holding that an officer did not violate the Fourth Amendment when he knocked on a homeowner's door before 6:00 a.m. and asked to check on the welfare of children in the

house).[7]  We have held that an early-morning knock and talk by multiple officers is not "inherently coercive."  *United States v. Abdenbi*, 361 F.3d 1282, 1288 (10th Cir. 2004).

When a homeowner preempts a knock and talk by attacking the approaching officers, the officers' approach "do[es] not implicate the Fourth Amendment."  *United States v. Carter*, 360 F.3d 1235, 1239 (10th Cir. 2004).  At that point, the officers have neither "seized anything or anyone," nor "conducted a search."  *Id.*

### ii.  Analysis

The Officers planned to knock on Mr. Martinez's front door when they approached his house.  App. at 995.  Mr. Martinez prevented them from reaching the door by charging at them with a bat.  The Officers neither seized him, searched his property, nor even initiated contact.  *See Carter*, 360 F.3d at 1238-40 (holding that no search or seizure occurred when officers walked up a driveway at midnight to conduct a knock and talk, but the homeowner ran out of the garage "in a combative manner" before they reached the door).[8]

---

[7] Although not precedential, we find the reasoning of this unpublished decision instructive.  *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

[8] We thus do not address whether the Fourth Amendment would have allowed the Officers to enter the house to check on Ms. Weaver even if Mr. Martinez had refused. *See, e.g.*, *United States v. Sanders*, 956 F.3d 534, 539-40 (8th Cir. 2020) (holding that police officers' warrantless entry into a house to check on a potential victim of domestic violence did not violate the Fourth Amendment under the community caretaking exception).

And even if the Officers had been able to carry out their plan, their approach at 3:30 a.m. to check on Ms. Weaver was reasonable despite Mr. Martinez's failure to answer the door for Officer Mitchell at 1:30 a.m. *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'"). Officer Mitchell testified that he did not know about a domestic violence incident when he approached the house at 1:30 a.m. App. at 301. Officer Herrera ordered the second visit only after confirming with corroborating witnesses that Mr. Rossi had attacked Ms. Weaver and that she might be at the house. *Id.* at 990-92. The Officers stopped at the property and approached the house only after seeing her car in the driveway, where it had not been when Officer Mitchell knocked earlier. *See* App. at 104, 535, 993-94. They approached with the intent of "knock[ing] and ask[ing] to speak with [Ms.] Weaver." *Id.* at 995; *see also Carloss*, 818 F.3d at 992 ("[A] police officer, like any member of the public, has an implied license to enter a home's curtilage to knock on the front door, seeking to speak with the home's occupants."). Mr. Martinez identifies no case holding that a welfare check on a victim of domestic violence is coercive simply because the police received no response when they approached the house hours earlier.

Finally, *Jardines*, *King*, and *Manzanares* do not apply here. The Officers did not search Mr. Martinez's property, *see Jardines*, 569 U.S. at 11-12, nor compel him to answer questions, *see King*, 563 U.S. at 469-70. Nor did they "remain[] in his home

16

without a warrant or valid exception to the warrant requirement" after he "unequivocally asked [them] to leave." *Manzanares*, 575 F.3d at 1143, 1146.

Based on the foregoing, Mr. Martinez cannot establish that the Officers violated his Fourth Amendment rights.

\* \* \* \*

Because Mr. Martinez has not shown the Officers' use of the blackout approach violated the BIA Handbook or the Constitution, and because the evidence showed they chose the blackout approach rather than other options, the Officers' decision was discretionary. *See Berkovitz*, 486 U.S. at 536; *see also Hardscrabble Ranch*, 840 F.3d at 1220 ("[T]he burden is on [the plaintiff] to prove that [the discretionary function exception] does not apply.").

## 2. **Public Policy**

Mr. Martinez fails to overcome the "presum[ption] that the [Officers'] acts [were] grounded in policy." *Gaubert*, 499 U.S. at 324; *see also Berkovitz*, 486 U.S. at 537. A police department's decision to teach the approach and an officer's decision to use it implicate policy concerns about safety and effectiveness. The trial evidence showed that the method (1) protects officers from potential attack when they approach homes, App. at 405, 533, 886, 1117-19, 1325, (2) prevents perpetrators of domestic violence from silencing victims as police near, *id.* at 1120, and (3) avoids causing a public disruption late at night, *id.* at 292.

17

On the other hand, the method risks that officers will be misperceived as trespassers, *id.* at 157, 167-68, 1328, jeopardizing officer and homeowner safety. The SUPD cautions trainees about this danger. *Id.* at 157. The blackout approach thus requires departments and officers to weigh safety and effectiveness considerations. *See Johnson v. U.S., Dep't of Interior*, 949 F.2d 332, 339 (10th Cir. 1991) (explaining that "the balancing of safety objectives against . . . practical considerations" sufficiently implicated public policy (footnote omitted)).

Mr. Martinez argues that the Officers' use of the blackout approach did not involve public policy because it was "chosen for the purpose of forcing persons to make contact with officers." Aplt. Suppl. Br. at 9. That is, the Officers sought merely to prevent Mr. Martinez from refusing to speak to them. But in assessing the public policy step of the *Berkovitz* analysis, "we do not consider the employee's 'subjective intent in exercising the discretion.'" *Garcia*, 533 F.3d at 1176 (quoting *Gaubert*, 499 U.S. at 325). We consider only "the nature of the actions taken and . . . whether they are susceptible to policy analysis." *Id.* (quotations omitted). As discussed, the blackout approach is susceptible to a public policy analysis. It does not matter whether the Officers in this particular case subjectively considered policy issues, though the evidence showed they weighed such concerns. *See* App. at 417, 526.

Mr. Martinez also relies on *Gaubert*, 499 U.S. at 325 n.7, and *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1538 (10th Cir. 1992), to argue the Officers' conduct was merely "ordinary discretion" not grounded in policy, and therefore does not meet the second step

18

of *Berkovitz.*  Aplt. Suppl. Br. at 8.  But in those cases, we explained that "ordinary discretion" encompasses acts such as driving a car in the course of official duties.  *See Gaubert*, 499 U.S. at 325 n.7; *Daigle*, 972 F.2d at 1538.  The discretion to use the blackout approach, by contrast, involves safety and effectiveness concerns crucial to police investigations.[9]

Finally, Mr. Martinez asserts that the blackout approach's "risk to both officer and civilian safety makes it difficult, if not impossible, to argue that [the Officers'] decisions were based on considerations of public policy."  Aplt. Suppl. Br. at 10.  But, as discussed, the blackout approach requires officers and police departments to balance competing

---

[9] *See, e.g.*, *Suter v. United States*, 441 F.3d 306, 311-12 (4th Cir. 2006) (holding that an undercover FBI agent's discretionary participation in the crimes the FBI was investigating was susceptible to a policy analysis); *Deuser v. Vecera*, 139 F.3d 1190, 1195-96 (8th Cir. 1998) (holding that National Park Service rangers' discretionary decisions about arresting and releasing the plaintiff were rooted in policy concerns about the safety of other parkgoers); *Mesa v. United States*, 123 F.3d 1435, 1438 (11th Cir. 1997) (holding that "[t]he decision as to how to locate and identify the subject of an arrest warrant prior to service of the warrant is susceptible to policy analysis" involving "such factors as the potential threat the subject poses to public safety and the likelihood that the subject may destroy evidence"); *Hart v. United States*, 630 F.3d 1085, 1090 (8th Cir. 2011) ("We readily conclude a federal law enforcement officer's on-the-spot decisions concerning how to effectuate an arrest—including how best to restrain, supervise, control or trust an arrestee—fall within the discretionary function exception to the FTCA absent a specific mandatory directive to the contrary.").

19

safety concerns. And Mr. Martinez does not explain why such risks would preclude consideration of policy concerns.[10]

* * * *

Policy concerns inform the blackout approach. Mr. Martinez has not shown otherwise. The Officers' conduct thus satisfied the second step of *Berkovitz*. The discretionary function exception applies, and the United States retains sovereign immunity.

## III.  **CONCLUSION**

The district court lacked subject matter jurisdiction over Mr. Martinez's negligence claim. We therefore remand with instructions to dismiss the negligence claim.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

---

[10] To the extent Mr. Martinez argues the discretionary function exception does not apply because the Officers "ignore[d] duties under tort law," Aplt. Suppl. Br. at 9, we note that "[t]he [discretionary function] exception applies even if the governmental employees were negligent," *Aragon*, 146 F.3d at 822.