# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3606

_____

Stuart Wright

*Plaintiff - Appellee*

v.

United States of America; John Clark; Walter R. Bradley, in his official capacity as the United States Marshal for the District of Kansas; Stacia A. Hylton, in her official capacity

*Defendants*

Sean Franklin, in his official capacity as a Deputy United States Marshal and in his individual capacity; Christopher Wallace, in his official capacity as a Deputy United States Marshal and in his individual capacity

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: September 21, 2015
Filed: December 23, 2015

_____

Before LOKEN, BENTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Appellee Stuart Wright filed suit against Deputy United States Marshals Sean Franklin and Christopher Wallace (the "Marshals") seeking damages pursuant to Bivens.[1] The Marshals moved for summary judgment based on qualified immunity, and the district court denied their motion. The Marshals brought an interlocutory appeal. We declined to address the merits of the appeal and remanded the case so that the district court could properly make findings of fact and conclusions of law sufficient to permit appellate review. On remand, the district court denied, in part, the Marshals' motion for summary judgment. We reverse and remand.

I.

We recount the facts as found by the district court in the light most favorable to Wright, the nonmoving party. Johnson v. Blaukat, 453 F.3d 1108, 1113 (8th Cir. 2006). In 2008, a Grand Jury in United States District Court for the District of Kansas indicted Vinol Wilson ("Wilson") for conspiracy to manufacture and possess with intent to distribute crack cocaine, and to possess with intent to distribute cocaine. Following the indictment, an arrest warrant was issued for Wilson.

Sean Franklin, a Deputy United States Marshal with the United States Marshal Service in the District of Kansas, began an investigation to locate and arrest Wilson. Through his investigation, Franklin learned that Wilson had a history of drug, weapons, and aggravated assault offenses and had previously served 78 months in prison for distributing crack cocaine and for using a firearm during a drug trafficking crime. He was considered armed and dangerous. Franklin also discovered that Wilson used steroids and participated in body building and dog fighting, and played basketball with a group of acquaintances in leagues and tournaments in and around the Greater Kansas City area.

_____

[1]Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

In 2008, Wilson played on a basketball team that competed in the Sunflower State Games. Franklin obtained a copy of the team roster and sought out Wilson's former teammates who might know Wilson's whereabouts. On April 15, 2009, at approximately 9:30 a.m., Franklin met with Walt Bethea, one of Wilson's former teammates from the 2008 Sunflower State Games, and showed him a 2005 Kansas driver's license photo of Wilson. Bethea confirmed that the man in the photo was "V"[2] and indicated that he knew Wilson was wanted by law enforcement on drug charges. Bethea told Franklin that Wilson played in an adult basketball league at the Grandview, Missouri Community Center on Wednesday evenings and he knew that Wilson was scheduled to play that evening at 7:30 p.m. Bethea stated that Wilson's team was comprised of black males who wore orange-colored jerseys.

At approximately 11:30 a.m on April 15, 2009, Franklin met with a confidential source ("CS") at the Grandview Community Center. Franklin showed CS the 2005 Kansas driver's license photo and asked him if he had seen the person pictured. CS stated that he had seen the person pictured, but did not know his name. CS indicated that he had seen the man wearing an orange-colored jersey with the number "23" on the back, with his hair in braids (or "corn-rows"), and sporting a goatee and gold-colored teeth.

CS obtained a roster for the man's team. He explained that the individuals playing in the league are not required to produce identification and the rosters are not checked for accuracy. Franklin recognized some of the names on the roster from the 2008 Sunflower State Games' roster. Wilson's name was not listed on the community center team's roster, but there was an entry for "Vyshon Watson." Franklin knew that Wilson had a son named Vyshon. CS told Franklin that he would assist in identifying Wilson if Wilson arrived for the scheduled game that evening.

---

[2]The record does not explain this, but presumably "V" is an alias for Vinol Wilson.

At 5:55 p.m., Franklin received a telephone call from a friend of Bethea's advising him that Wilson's team's game had been rescheduled for 6:30 p.m., an hour earlier than planned. Franklin then placed a call to CS to verify this information, but CS did not answer. Around the same time, Franklin set up a briefing area near the parking lot for Grandview High School to organize the arrest team and operation to arrest Wilson.

At approximately 6:15 p.m., CS returned Franklin's call and confirmed that Wilson's game had been moved up an hour and was due to start at 6:30 p.m. Furthermore, CS advised Franklin that Wilson had been seen in the gym. A few minutes later, CS called Franklin again to say that Wilson was on the gym floor, shooting baskets before his game in an orange-colored jersey with the number "23" and wearing his hair in braids.

At 6:45 p.m., Franklin and five other Deputy United States Marshals, including Wallace, arrived at the Grandview Community Center. Franklin decided to arrest Wilson in the middle of the basketball game because he thought it would offer the greatest protection for the safety of the public and law enforcement. The Grandview Community Center parking lot was crowded with cars and people, including young people, and Franklin believed it might pose an undue public danger to try to apprehend Wilson as he was leaving the Community Center. Franklin also wanted to avoid a high speed vehicle chase. Moreover, Franklin thought Wilson would be somewhat less likely to have a weapon on him if they made the arrest while the basketball game was in progress.

Franklin was wearing his U.S. Marshals Service badge on a chain around his neck. He showed the badge to the individual running the buzzer and game clock and asked the individual to sound the buzzer and stop the game. After the buzzer sounded, Franklin and Wallace walked onto the basketball court and approached Stuart Wright, a black male with braided hair, wearing an orange-colored jersey with

-4-

number "23" on it, who was playing a full-court game of basketball when Franklin approached him.

Franklin was not in uniform but was wearing a Kansas City Royals jersey. Wright did not see the badge around Franklin's neck or anything identifying him as a law enforcement officer. Franklin pointed his gun at Wright as he approached him. Franklin shouted that he was a United States Marshal, which Wright does not dispute, but Wright could not understand what Franklin was saying. At some point, Wright heard the name Vinol mentioned, and he told Franklin his name and said that he had identification in the gym.

Franklin told Wright multiple times to get on the ground but Wright kept backing away, so Franklin grabbed Wright's shirt and kicked at his legs. Still standing, Wright came directly between Franklin and Wallace. Wallace deployed his Taser, hitting Wright in the back and causing Wright to fall. Franklin leaned over Wright and asked his name. Wright responded that his name was Stuart Wright, a name that Franklin recognized from the 2008 Sunflower State Games roster. Franklin said, "Don't lie to me." Wright again told Franklin that his name was Stuart Wright. Then, Franklin announced, "Let's get him out of here." Wright was pulled up and handcuffed. People present told the Marshals that he was Stuart Wright not Vinol Wilson.

As Wright was taken out of the Community Center, he spotted Grandview Police Officer Clausing. Wright recognized him as a Grandview High School graduate and said, "My name is Stuart Wright. I graduated from Grandview High School in 1996. You know me." Officer Clausing replied, "That's not the guy. I know him." The Marshals continued to escort Wright outside the Community Center and put him in the back of a police patrol car.

-5-

Stuart Wright's brother, Stephen Wright ("Stephen"), retrieved Wright's driver's license from his gym bag and gave the license to Franklin shortly after Wright was removed from the gym. Franklin told Stephen that he knew Wright was not Wilson, but Wright had information about Wilson. Franklin and one other man told Stephen to speak with Wright and encourage Wright to tell the officers what he knew about Wilson. Stephen was allowed to talk to Wright briefly in the car and told Wright to give the officers any information he had about Wilson.

The officers kept Wright in custody and asked him questions about whether he had played basketball with Wilson, where Wilson was, and how Wright could help them find Wilson. Wright told the officers that he did not know where Wilson was or how to find him. Wright overheard some of the officers discussing a vacation day the next day, how everything had happened so fast, about hearing the "pop-pop" sounds, and how they had gotten the wrong guy.

After fifteen to twenty minutes, the officers pulled Wright out of the car and told him they were going to pull the probes out of him. One of the officers asked if he needed an ambulance, but Stephen told them he was going to take Wright to the hospital, which he did. One of the officers told Wright that they were going to uncuff him, and then asked Wright, "Now, you're not going to go all ape-shit on me, are you?" Wright told him, "No." Franklin told Wright that he had searched for him in the computer and that he had two traffic warrants that he needed to handle. Wright was then released after being in custody for no longer than twenty minutes.

At the time in question, Wilson was approximately 5'11" tall and weighed roughly 200 pounds. He had gold caps on all of his teeth. Wright was about 6'5" tall and weighed 280 pounds. Wright has not alleged any permanent or lasting injury from the Taser shock.

Appellant Wright filed this <u>Bivens</u> action, alleging that the Marshals' false arrest, unreasonable search and seizure, and use of excessive force violated his Fourth and Fifth Amendment rights. The Marshals moved for summary judgment based on qualified immunity, and the district court denied their motion. The Marshals brought an interlocutory appeal. We declined to address the merits of the appeal and remanded the case so that the district court could properly make findings of fact and conclusions of law sufficient to permit appellate review. <u>Wright v. United States</u>, 545 Fed.Appx. 588, 590 (8th Cir. 2013) (unpublished per curiam).

On remand, the district court granted in part and denied in part the Marshals' motion for summary judgment. Specifically, the court held that the Marshals were entitled to summary judgment on Wright's false arrest claim, but not on his excessive force and improper search and seizure claims. The court found that "[t]he video does not support any indication that Wright would have recognized [the Marshals] as law enforcement officer[s], let alone attempted to evade [the Marshals] or physically resisted [the Marshals'] attempts to take him into custody." <u>Wright v. United States</u>, 2014 WL 4630959, at * 8 (W.D. Mo. Sept. 16, 2014). Thus, the Court concluded that the Marshals were not justified in the force that they used. Furthermore, the court determined that the post-arrest conduct of the Marshals was inappropriate as they continued to detain Wright even after they knew he was not Wilson. The Marshals appeal the district court's denial of summary judgment on the excessive force and unreasonable search and seizure claims.[3]

## II.

We review the district court's summary judgment decision regarding qualified immunity *de novo*, viewing the facts in the light most favorable to the nonmoving

---

[3]We note that Wright does not appeal the district court's finding that the Marshals were entitled to summary judgment on Wright's false arrest claim.

party.  McKenney v. Harrison,  635 F.3d 354, 358 (8th Cir. 2011).  Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Qualified immunity shields a government official from liability and the burdens of litigation unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Evaluating whether a government official is entitled to qualified immunity requires a two-step inquiry:  (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.  Pearson v. Callahan, 555 U.S. 223,  232 (2009).  Courts have discretion to decide which part of the inquiry to address first.  Id. at 236.

A.

We will first address Wright's excessive force claim.  We begin our inquiry by determining whether the Marshals' conduct violated clearly established law at the time of the incident.  To avoid summary judgment based on qualified immunity, Wright must offer sufficient evidence to show a genuine issue of material fact about whether a reasonable officer would have been on notice that the officer's conduct violated a clearly established right.  Engleman v. Deputy Murray, 546 F.3d 944, 947 (8th Cir. 2008).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."  Id. (citing Mitchell v. Forsyth, 472 U.S. 511, 535 n. 12 (1985)).  "But it is to say that in the light of pre-existing law the

unlawfulness must be apparent." Id. (citations omitted). Petitioners can show a clearly established right through "cases of controlling authority in their jurisdiction at the time of the incident" or through a "consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." Wilson v. Layne, 526 U.S. 603, 617 (1999). The pertinent inquiry is whether the state of the law at the time gave the official "fair warning" that such conduct was unlawful in the situation he confronted. Hope v. Pelzer, 536 U.S. 730, 741 (2002); Saucier v. Katz, 533 U.S. 194, 202 (2001). If a plaintiff fails to assert a constitutional violation under the law as interpreted at the time, then the defendant is entitled to summary judgment. Engleman, 546 F.3d at 947. Whether the right at issue was "clearly established" is a question of law for the court to decide. Littrell v. Franklin, 388 F.3d 578, 582 (8th Cir. 2004).

Wright argues that the Marshals, through a footnote in their motion for summary judgment, expressly waived any argument that the right at issue was not clearly established in April 2009. The footnote states, "In the present motion, however, the second prong of Saucier is not being argued." While this statement does not constitute an express waiver, it is true that the Marshals did not argue the clearly-established issue before the district court in their initial motion for summary judgment. Nor did the Marshals argue the issue in their supplemental brief to the district court after the first interlocutory appeal. "As a general rule, we do not consider arguments or theories on appeal that were not advanced in the proceedings below." Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir. 2000) (quoting Wright v. Newman, 735 F.2d 1073, 1076 (8th Cir. 1984)). However, we are to resolve the issue of whether a right was clearly established at the time the conduct occurred using our "full knowledge of [our own and other relevant] precedents." Elder v. Holloway, 510 U.S. 510, 516 (1994) (citing Davis v. Scherer, 468 U.S. 183, 192 n.9 (1984)). "Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law, not one of 'legal facts.'" Id. (citing Mitchell, 472 U.S. at

-9-

528). This question of law must be resolved *de novo* on appeal. Id. (citing Pierce v. Underwood, 487 U.S. 552, 558 (1988)). Therefore, we will proceed with a *de novo* review of whether it was clearly established in April 2009 that a single Taser shock causing no lasting injury to a man reasonably identified as the suspect and purported to be armed and dangerous violated the Fourth Amendment.[4]

Recently, in Hollingsworth v. City of St. Ann, we determined that it was not clearly established in July 2009 that the use of a Taser resulting in only *de minimis* injury violated the Fourth Amendment. 800 F.3d 985, 991 (8th Cir. 2015). Despite a Taser's "unique capability to cause high levels of pain without long-term injury, 'we have not categorized the Taser as an implement of force whose use establishes, as a matter of law, more than *de minimis* injury.'" Id. at 990-91 (quoting LaCross v. City of Duluth, 713 F.3d 1155, 1158 (8th Cir. 2013)). In April 2009, when the events at issue in this case transpired, the state of the law was no different. "'[A] reasonable officer could have believed that as long as he did not cause more than *de minimis* injury to an arrestee, his actions would not run afoul of the Fourth Amendment.'" Id. at 991 (quoting Bishop v. Glazier, 723 F.3d 957, 962 (8th Cir. 2013)). Therefore, the Marshals are entitled to qualified immunity on Wright's excessive force claim.

The district court, despite the Marshals' failure to argue the clearly established issue, cited to our decision in Shekleton v. Eichenberger in support of the court's conclusion that the tasering of Wright was excessive force in violation of clearly established law at the time. 677 F.3d 361 (8th Cir. 2012). In Shekleton, we held that the plaintiff had established that a violation of a constitutional right occurred because a reasonable officer would not have deployed his Taser against "an unarmed suspected misdemeanant, who did not resist arrest, did not threaten the officer, did not attempt

---

[4]In his complaint, Wright further alleges that the Marshals "threw him to the ground." In Wright's declaration, however, he indicated that he fell to the ground as he was tased. Therefore, we consider Wright's fall as relating to the issue of excessive force due to the tasing.

to run from him, and did not behave aggressively towards him." Id. at 366. We have since confirmed that "non-violent, non-fleeing subjects have a clearly established right to be free from the use of tasers." DeBoise v. Taser Intern., Inc., 760 F.3d 892, 897 (8th Cir. 2014).

The facts in Shekleton are distinguishable from those in this case in that a Grand Jury had indicted Vinol Wilson for several felonies. Wilson had previously served 78 months in prison for distributing crack cocaine and for using a firearm during a drug trafficking crime. He was considered armed and dangerous. In contrast, the suspect in Shekleton was arrested for public intoxication, a misdemeanor. 677 F.3d at 366. Moreover, the suspect in Shekleton was not a fugitive from justice with a felonious past who was considered armed and dangerous. See id. We evaluate the reasonableness of an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 39 (1989). The Marshals, well aware of Wilson's history of drug, weapons, and aggravated assault offenses, had been attempting to locate Wilson for months. Their conduct cannot be likened to that of the officer in Shekleton who tased a non-violent misdemeanant. Thus, our holding in Shekleton does not change our finding that the state of the law in April 2009 was such that a reasonable officer would not have had fair warning that using a single Tazer shock against a suspected felon would have violated clearly established Constitutional rights.

Accordingly, we hold that the Marshals are entitled to qualified immunity on Wright's excessive force claim because it was not clearly established in April 2009 that the use of a Tazer against a suspected armed and dangerous felon violated the Fourth Amendment.

B.

Next, we turn to Wright's unreasonable search and seizure claim. Wright claims that the Marshals violated his Fourth Amendment rights by detaining him after they realized that he was not Vinol Wilson. He does not challenge the validity of the arrest warrant for Vinol Wilson, but complains only of the detention subsequent to the Marshals discovery that they had arrested the wrong man. The Marshals admit that they did not release Wright as soon as they realized that they had made a mistake, but assert three independent bases for Wright's continued detention: (1) Wright resisted arrest; (2) the Marshals discovered two outstanding arrest warrants for Wright after they realized he was not Vinol Wilson; (3) the twenty-minute detention was a reasonable period of time in which to detain Wright given the confusion at the scene.

Generally, "[c]ontinuing to hold an individual in handcuffs once it has been determined that there was no lawful basis for the initial seizure is unlawful within the meaning of the Fourth Amendment." Hill v. Scott, 349 F.3d 1068, 1074 (8th Cir. 2003) (quoting Rogers v. Powell, 120 F.3d 446, 456 (3d Cir. 1997)). Nevertheless, a separate, independent basis may support continued detention. Id. (citing Rogers, 120 F.3d at 456).

Under Missouri law, it is a crime to resist arrest. Mo. Ann. Stat. § 575.150 (providing that a person commits the crime of resisting arrest "if, knowing that a law enforcement officer is making an arrest, . . . the person [r]esists the arrest, stop or detention of such person by using or threatening the use of violence or physical force or by fleeing from such officer"). It is undisputed that Wright backed away from the Marshals who approached him on the basketball court. According to Wright, he did not yield to Franklin's commands to get on the ground because he could not understand what Franklin was saying. We must view the facts in the light most favorable to Wright, but this is sufficient for the Marshals to have probable cause to believe that Wright had committed the crime of resisting arrest and justify their twenty

-12-

minute restraint on Wright's liberty. See Gerstein v. Pugh, 420 U.S. 103, 114-15 (1975) ("a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of a crime, and for a brief period of detention to take the administrative steps incident to arrest").

Wright argues that the Marshals did not articulate this motive for his continued detention until briefing this appeal, and that such a justification never occurred to them during the detention. Wright's assertion advances a subjective approach that is inconsistent with Fourth Amendment jurisprudence. See Kentucky v. King, 563 U.S. 452, 464 (2011) (acknowledging that the Supreme Court has never held "an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment"); Brigham City v. Stuart, 547 U.S. 398, 404 (2006) ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind . . ."). The question we must ask is whether "the circumstances, viewed *objectively*, justify the action." King, 563 U.S. at 464 (quoting Brigham City, 547 U.S. at 404). Moreover, while the Marshals may not have articulated Wright's resisting arrest as a basis for the twenty-minute detention until this appeal, the Marshals have consistently maintained that Wright resisted arrest and disobeyed their commands. Thus, the Marshals may very well have considered Wright's behavior during the arrest when they chose to detain him for twenty minutes. Moreover, once the Marshals confirmed that the man they had arrested was in fact Stuart Wright, not Vinol Wilson, the Marshals discovered that Wright had two outstanding warrants. These, too, provide separate and independent bases for his continued detention.

Finally, a twenty-minute detention is not unreasonable after the scene of confusion and is insufficient to recover on a Bivens claim for damages against the Marshals. "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." United States v. Montoya De Hernandez, 473 U.S. 531, 537 (1985) (citing New Jersey v. T.L.O., 469 U.S. 325, 337 (1985)). Furthermore, "the Fourth Amendment does not require

employing the least intrusive means, because '[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 837 (quoting United States v. Martinez–Fuerte, 428 U.S. 543, 556-57, n. 12 (1976)). The Supreme Court has recognized that "the lapse of a certain amount of time" is a factor in assessing the existence of a constitutional encroachment. See Baker v. McCollan, 443 U.S. 137, 145 (1979) ("mere detention pursuant to a valid arrest but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law'"). In Baker, the police arrested a man on a warrant intended for his brother and detained him for three days in spite of his repeated assertions of innocence. Baker, 443 U.S. at 141. When the officials realized their error on the third day of the man's detention, they released him. Id. The Supreme Court held that the officials did not violate the Constitutional rights of the man mistaken for his brother because the warrant conformed to the requirements of the Fourth Amendment and was supported by probable cause. Id. at 145-46 ("Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence . . .").

The facts in this case do not reflect the precise situation presented in Baker, "but, as in all Fourth Amendment cases, we are obliged to look to all the facts and circumstances of this case in light of the principles set forth in . . . prior decisions." South Dakota v. Opperman, 428 U.S. 364, 375 (1976). Wright was held for up to twenty minutes after the Marshals realized that he was not Vinol Wilson. Under the totality of circumstances, we conclude the delay in releasing Wright was reasonable. The Marshals removed Wright from the commotion of the gymnasium and verified his identity. Detaining Wright in the police vehicle allowed the Marshals to defuse the situation and reorient themselves. The twenty minute delay was a minimal intrusion

on Wright's liberty interest and may have ensured that no further mistakes were made that day. "A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." United States v. Sharpe, 470 U.S. 675, 686-687 (1985). Nevertheless, for Fourth Amendment purposes, reasonableness is evaluated from the perspective of a reasonable officer on the scene, not from the more comfortable view of hindsight. See Graham, 490 U.S. at 396 (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)); see also Young v. City of Little Rock, 249 F.3d 730, 735 (8th Cir. 2001) ("We decline to hold officers in this situation to the niceties of legal distinctions, even though the distinctions might seem persuasive to judges in the light of hindsight."). The Fourth Amendment does not demand perfection from law enforcement officers; it only requires that their conduct be reasonable under the totality of the circumstances. The twenty-minute detention was not an unreasonable seizure under the Fourth Amendment, and therefore the Marshals are entitled to summary judgment on Wright's claim for unreasonable seizure.

## III.

The judgment denying the Marshals' motion for summary judgment is reversed, and the case is remanded to the district court for entry of an order granting qualified immunity to Deputies Franklin and Wallace.

_____