# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1777
_____

Dejuan Haynes

*Plaintiff - Appellant*

v.

Brian Minnehan, Individually and in his official capacity as a law enforcement officer for the Des Moines, Iowa Police Department; Ryan Steinkamp, Individually and in his official capacity as a law enforcement officer for the Des Moines, Iowa Police Department; Dana Wingert, individually and in his official capacity as Chief of Police for the Des Moines, Iowa Police Department; City of Des Moines, Iowa

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: May 14, 2021
Filed: September 21, 2021
_____

Before SMITH, Chief Judge, SHEPHERD and GRASZ, Circuit Judges.
_____

GRASZ, Circuit Judge.

On a well-lit summer evening in a Des Moines neighborhood with community-reported drug crimes, police officers Brian Minnehan and Ryan Steinkamp lawfully stopped Dejuan Haynes for suspected (yet mistaken) involvement in a drug deal. Beyond that suspicion, the exceedingly polite and

cooperative exchange between the three did not make either officer view Haynes as a safety risk. But when Haynes could not find his driver's license (yet shared three separate cards bearing his name), Steinkamp handcuffed him. While the polite interaction continued, the cuffs stayed on. They also stayed on after a clean frisk and a consensual pocket search. They even stayed on after the officers turned down more searches (another pocket and Haynes's car) and another squad car's offer to help. Haynes appeals the district court's adverse grant of summary judgment on his Fourth Amendment claims against the officers, the City, and Police Chief Dana Wingert, *see* 42 U.S.C. § 1983. We reverse.

## I. Introduction

The Police Department tapped officers Minnehan, Steinkamp, and Ryan Garrett for the Summer Enforcement Team, "a proactive policing initiative meant to reduce criminal activity in the areas of the City" with criminal-activity reports, "either by arrest or by public request[]." Summer-Enforcement-Team officers would focus on "suspicious interactions that could involve illegal drugs."

After receiving community complaints about drug activity and other crimes, the Summer Enforcement Team sent the three officers to the neighborhood where Haynes attended church. Dressed in plainclothes in an unmarked van, Garrett kept lookout while Minnehan and Steinkamp patrolled in a cruiser. If Garrett suspected criminal activity, he would tell Minnehan and Steinkamp. Then, they would follow up on leads.

From the van, Garrett saw a Volkswagen Phaeton sedan driving south. It looked "expensive and unique."

Garrett saw a person on the sidewalk approach the Volkswagen's passenger's side window. The officer saw a ten-to-fifteen second meeting that involved "an exchange of something between them." Given his experience, his training, his observations, the meeting's length, and "the nature of crime reported in the

-2-

neighborhood[,] . . . Garrett suspected that this interaction may have been an illegal drug transaction."

And so, Garrett trailed the car. He then told Steinkamp and Minnehan that he suspected a hand-to-hand drug deal.

While still light outside, Steinkamp and Minnehan followed the car. When the car stopped at a stop sign, the officers activated their lights. The officers did not radio the stop to dispatch.

Bodycam and dashcam videos captured what happened next. After stopping his car, Haynes turned his head toward the officers and stuck his palms outside the driver's side window to show that his hands were empty. Approaching the car from the back, Steinkamp headed to the driver's side and Minnehan to the passenger's side. Steinkamp asked, "What were you doing?" Haynes explained that he had just given some change away.

Minnehan stated, "You got a cracked windshield, man." Haynes explained that he had not repaired the windshield because the car's Bentley parts would make the repairs costly ($2,500).[1]

When Steinkamp asked for identification, Haynes asked for permission to look for it. But Haynes could not locate his license. So, he gave Steinkamp a Visa credit card and a Costco card. Both cards bore his name. And the Costco card

---

[1]The dissent notes that Haynes's vehicle "had a cracked windshield." We agree this added to the already-existing probable cause to stop Haynes's vehicle. Whether the crack was a violation of Iowa law is not ascertainable from the record. Viewed in a light most favorable to Haynes, the video and the recorded conversation between Haynes and the officers indicate Haynes had been previously advised by a law enforcement officer that the crack was not sufficiently obstructive to be a violation. Minnehan Body Camera 1:12-1:35. In any event, if the officers thought it was a violation, they did not issue any citation. More importantly, the window has no relevance to whether the prolonged handcuffing of Haynes was constitutional.

showed his photograph. Steinkamp jotted down Haynes's Social Security number, his birthdate, and his address.

Haynes also handed his insurance card to Minnehan. That card correctly listed Haynes's name.

Aside from the suspected drug deal, the officers would later testify that nothing about Haynes's behavior led them to see him as a safety risk or uncooperative. Both officers looked into the car. Neither saw anything drug-related nor smelled marijuana. And neither saw weapons.

Steinkamp's training taught him "to look for suspicious mannerisms, like heavy breathing, sweating, and fluctuation in [the] carotid artery." He saw none in Haynes. Instead, Haynes's cooperativeness led Steinkamp to immediately realize that this "was 'gonna be a pretty quick stop[.]'" And Minnehan characterized Haynes as "extremely cooperative," "very relaxed," polite, and pleasant. But because Haynes did not have his license, Steinkamp asked him to exit his car.

When Haynes complied, Steinkamp stated, "I'm going to detain you right now because I don't know who you are." Steinkamp then handcuffed Haynes. Both officers would later testify that if a driver lacked identification during a traffic stop, as a "standard practice," the officers would handcuff the driver.

Their supervisor, Sargent Jeffrey Robinson, testified that "typically" an officer would handcuff an individual during every *Terry* frisk. *See Terry v. Ohio*, 392 U.S. 1, 19–21 (1968).

Minnehan, meanwhile, asked Haynes if he had anything illegal on him or in the car. Haynes said that he did not. Minnehan told Haynes that the handcuffing stemmed from his missing license and his presence in a high-crime area. Haynes remarked, "The car and me being over here don't match." Minnehan responded that "it's a nice car for the area."

Then Steinkamp began a pat down while asking again if Haynes had anything [illegal] on him.  When Steinkamp asked to do a pocket check, Haynes consented.  Steinkamp checked Haynes's left and righthand jeans pockets, patted down the area between his legs, and the front of his pants.  During the frisk, Minnehan offered another explanation for the handcuffing and frisking: that he had seen "probably 75 hand-to-hand sales of crack at the same spot."

Steinkamp asked if Haynes had another pair of pants underneath his jeans.  In his affirmative response, Haynes offered to let Steinkamp "undo [the] belt and check the pockets[.]"  Steinkamp did so.

Steinkamp did not find any drugs.  He did not find any weapons, either.[2]

As Steinkamp faced away from Haynes and headed back to the cruiser, Haynes told the officers about an inside pocket and gave them consent to check it.  Neither did so.  Steinkamp later testified that he chose not to search that pocket because he "had no reason to believe there was more evidence at that time."

With Steinkamp back at the cruiser, Minnehan watched over Haynes, who stood in the road in full public view in handcuffs with his belt unbuckled and his pants unzipped.  Minnehan again asked if Haynes had anything illegal in the car.  As Haynes said that he did not, he invited Minnehan to search the car.  Minnehan declined.

---

[2]The dissent states that the officers found "a wad of cash" on Haynes.  Yet, the video evidence clearly shows that the officers determined the "wad" of cash was just some small bills ("now I see it's just fives and singles") and that the officers did not find the cash consistent with drug dealing or otherwise suspicious.  Both officers are heard stating their initial suspicion as to the cash had been dispelled when they "look[ed] into it" and "figure[d] it out."  Steinkamp Body Camera 5:54-6:05.

Steinkamp returned to reconfirm Haynes's birthdate, name, and Social Security number before heading back to the cruiser again.

A few seconds later, another police car slowed down behind Minnehan. Minnehan said, "We're all good man. Thanks." That police car drove off.

Over two minutes later, Steinkamp returned and stated, "We're good." Then Minnehan finally removed the handcuffs. From the time the pat down ended until Haynes was uncuffed was nearly five minutes.

The officers later said that Haynes correctly identified himself, his address, and his Social Security number. And later, Garrett verified Haynes's explanation (stopping to give a person change).

This lawsuit, alleging federal and state constitutional violations, followed.[3] The officers, the City, and Wingert moved for summary judgment on qualified immunity grounds. The district court granted that motion. It reasoned that Haynes had no clearly established right to be free of handcuffs post-frisk. And it concluded that the record did not show a longer-than-necessary stop. It dismissed Haynes's *Monell* claims for failure to train and supervise as "without merit" given its conclusions on the alleged constitutional violations. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

## II. Discussion

We review grants of qualified immunity de novo, viewing the facts in the light most favorable to Haynes. *Smith v. City of Brooklyn Park*, 757 F.3d 765, 772 (8th Cir. 2014). To determine if the officers should receive qualified immunity, we examine if: (1) the facts, viewed in the light most favorable to Haynes, show that the officers deprived him of a constitutional or statutory right; and (2) that right was

---

[3]Before summary judgment, Haynes voluntarily dismissed several claims.

-6-

clearly established when the alleged deprivation occurred. *See Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015).

The Fourth Amendment bars "unreasonable . . . seizures." U.S. Const. amend. IV. "A seizure occurs 'if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Warren*, 984 F.3d 1301, 1303 (8th Cir. 2021) (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984)).

An officer can "conduct a brief, investigatory stop"—what we call a "*Terry* stop"—"when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (quoting *Terry*, 392 U.S. at 19–20). A lawful *Terry* stop "may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011) (affirming qualified-immunity denial).

The *Terry* analysis examines whether: (1) the stop began lawfully; and (2) the way officers conducted the stop "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *Terry*, 392 U.S. at 19–20).

Because Haynes does not contest the first *Terry* prong, we only consider the second. Oral Arg. at 1:10–33. Under the second prong, "officers may use handcuffs as a reasonable precaution to protect the officers' safety and maintain the status quo during the *Terry* stop." *El-Ghazzawy*, 636 F.3d at 457.

But because handcuffs constitute "greater than a de minimus intrusion," their use "requires the [officer] to demonstrate that the facts available to the officer would warrant a man of reasonable caution in [believing] that the action taken was appropriate." *Id.* (first alteration in original) (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1122–23 (10th Cir. 2010)). In particular, *Terry* "requires some

reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case." *Id.* (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005)). We have already held that handcuffing "absent any concern for safety" violates the second *Terry* prong. *Id.* at 460 (citing *Manzanares v. Higdon*, 575 F.3d 1135, 1150 (10th Cir. 2009)).[4]

At the outset, by relying on the connection between weapons and drug deals, we have repeatedly equated a person's suspected drug-deal involvement with a reasonable belief that the same person may be armed and dangerous.[5]

But as new information flows in, a reasonable belief can dissolve into an unreasonable one. *United States v. Tovar-Valdivia*, 193 F.3d 1025, 1028 n.1 (8th Cir. 1999) (explaining *Terry* did not "authorize the police officer to handcuff and search an individual *after* the initial pat-down of the bulge did not confirm the existence of a weapon or contraband"). This case is an example of how.

---

[4]Questions about "identity are a routine and accepted part of many *Terry* stops." *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004). Those questions, including requests for identification, do not by themselves "'constitute a Fourth Amendment seizure,' so 'a police officer is free to ask a person for identification without implicating the Fourth Amendment.'" *Chestnut v. Wallace*, 947 F.3d 1085, 1089 (8th Cir. 2020) (quoting *Hiibel*, 542 U.S. at 185). Under the dissent's view, handcuffing could easily become a routine part of a *Terry* stop as officers routinely check identification and warrant status even in the absence of reasons to believe the subject is dangerous. But absent an objective safety risk, handcuffing is *not* a routine part of a *Terry* stop. *El-Ghazzawy*, 636 F.3d at 457; *see also Ramos v. City of Chicago*, 716 F.3d 1013, 1017–18 (7th Cir. 2013) (explaining that handcuff use "*to ensure officer safety* in a *Terry* stop of brief duration . . . does not mean that law enforcement has carte blanche to handcuff routinely") (emphasis added).

[5]*See, e.g.*, *United States v. Johnson*, 528 F.3d 575, 579–80 (8th Cir. 2008) (upholding handcuffing during search-warrant execution when officers suspected involvement in drug trafficking and a "likelihood that [defendant] had access to a weapon").

The officers gained additional information about Haynes by what he shared (his name, address, Social Security number, his Costco card with his photo, his Visa credit card, and his insurance card). And they gained information about him by observing how he acted (cooperative, polite, and relaxed).

They also gained information about Haynes by what they did not see (drugs or weapons), find (drugs or weapons), or smell (drugs). The officers chose *not* to gather extra information from readily available sources (searching Haynes's extra pocket and his car).

From the start, the officers outnumbered Haynes, who neither officer described as a large or imposing figure. They experienced no visibility issues. At no point did they seek help (by contacting dispatch). And when unsolicited help arrived (the other cruiser), they sent it away.

Yet, the officers kept Haynes in the road with his belt unbuckled and his pants unzipped for over five minutes. In handcuffs.

Given these circumstances, the officers failed to point to specific facts supporting an objective safety concern during the encounter. *See El-Ghazzawy*, 636 F.3d at 458–59; *see Lundstrom*, 616 F.3d at 1124 ("We stress the lack of corroborating evidence at this point in the encounter."). As a result, we conclude that their conduct "was not reasonably necessary to protect [their] personal safety or maintain the status quo during the investigatory stop." *El-Ghazzawy*, 636 F.3d at 459; *compare Waters v. Madson*, 921 F.3d 725, 738 (8th Cir. 2019) ("[U]npredictability, evasiveness, argumentative demeanor, refusal to []obey legitimate officer commands, and . . . size difference between [suspect] and the officers, . . . viewed as a whole, . . . could cause [officers] to reasonably believe they needed to handcuff [the suspect] and place . . . in . . . squad car to preserve the status quo."), *with United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (holding that an initially permissible *Terry* stop in drug-trafficking case became unlawful after a clean frisk of defendant and his companion "confirmed that neither man was armed"

and "having both men exit the vehicle . . . eliminated the risk that the men might obtain any weapon from therein").

So, the way that the officers conducted the seizure "was not 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *El-Ghazzawy*, 636 F.3d at 459 (quoting *Terry*, 392 U.S. at 19–20). Consequently, the initially lawful *Terry* stop ultimately violated Haynes's Fourth Amendment rights. *See id.* Because the officers violated the Constitution, Haynes satisfied the first qualified-immunity prong. *See Wright*, 813 F.3d at 695.

For the second qualified-immunity prong, we ask if case law would have fairly notified every reasonable officer in Minnehan and Steinkamp's shoes that their conduct would violate the Constitution. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also El-Ghazzawy*, 636 F.3d at 459. We conclude that it does.

More than six years before Steinkamp handcuffed Haynes, we said that it was "well established that if suspects are cooperative and officers have no objective concerns for safety, the officers may not use intrusive tactics such as handcuffing absent any extraordinary circumstances." *El-Ghazzawy*, 636 F.3d at 460. We concluded that "the prior case law provided fair warning to [an officer] at the time of the incident" that a reasonable officer in her place "could not have believed it was lawful to handcuff and frisk a suspect absent any concern for safety." *Id.* And even earlier, we rejected an argument that reasonable suspicion justified handcuffing a suspect after a frisk confirmed that the suspect lacked a weapon or contraband. *Tovar-Valdivia*, 193 F.3d at 1028 n.1; *Manzanares*, 575 F.3d at 1150 ("[A]ny reasonable officer would understand that it is unconstitutional to handcuff someone absent probable cause or an articulable basis to suspect a threat to officer safety combined with reasonable suspicion.").[6]

---

[6]The dissent acknowledges that "the Fourth Amendment requires that an officer possess 'some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose' before handcuffing a suspect during a *Terry* stop." That is precisely why the continued

-10-

The dissent suggests this case is controlled by our recent decision in *Pollreis v. Marzolf*, 2021 WL 3610875 (8th Cir. Aug. 16, 2021). But we believe *Pollreis* differs from this case in a number of important ways. There, on a dark and rainy night, a police officer set up a perimeter around a car crash to apprehend fleeing suspects of gang-related activity, one of whom was believed to be carrying a gun. *Id.* at *1. The officer encountered two individuals who matched a vague description of the fleeing suspects. *Id.* The officer held them for several minutes until backup arrived and then handcuffed and frisked them before letting them go. *Id.* at *1–3. In stark contrast to the situation in *Pollreis*, no dispatcher warned that Haynes was likely armed. There was not a solitary officer left with multiple suspects in the dark. Haynes, unlike the suspects in *Pollreis*, had been thoroughly searched and cleared for weapons, contraband, and evidence of drug dealing. Yet, he remained handcuffed. In sum, the reasonable concern of danger to the officer present in *Pollreis* was lacking here.

Because Minnehan and Steinkamp had fair notice that they could not handcuff Haynes without an objective safety concern, we conclude that the district court erred in granting qualified immunity. By extension, that conclusion also upends the district court's *Monell* holding, which it fused to its qualified-immunity analysis.

### III. Conclusion

For these reasons, we reverse the summary-judgment grant. We remand for proceedings consistent with this opinion.

---

cuffing of Haynes was a clearly established violation of the Fourth Amendment. Once all reasonable belief that Haynes was armed or dangerous was dispelled, he was kept publicly displayed, pants undone, in handcuffs for no legitimate purpose. Haynes was not threatening in any respect. He was a model of politeness and cooperation.

SHEPHERD, Circuit Judge, dissenting.

Officers Minnehan and Steinkamp stopped Haynes's vehicle in a high crime area after being advised by a third officer that he had observed what appeared to be a hand-to-hand drug transaction involving Haynes's vehicle a few minutes earlier. Further, Officers Minnehan and Steinkamp observed that Haynes's vehicle had a cracked windshield. See Iowa Code § 321.438(1) ("A person shall not drive a motor vehicle equipped with a windshield, sidewings, or side or rear windows which do not permit clear vision."). I agree with the majority that this traffic stop was constitutional based upon this suspicion and the possible traffic violation.[7]

Further, the majority properly concludes that Officer Steinkamp constitutionally placed Haynes in handcuffs, noting that "we have repeatedly equated a person's suspected drug-deal involvement with a reasonable belief that the same person may be armed and dangerous." See ante at 8 (citing United States v. Johnson, 528 F.3d 575, 579-80 (8th Cir. 2008)). However, the majority denies qualified immunity to the officers because the handcuffs were not removed at the conclusion of Officer Steinkamp's patdown and search of Haynes's person, and Haynes remained handcuffed for an additional approximately four minutes and forty-five seconds. I disagree because it was not clearly established that the officers could not constitutionally keep Haynes handcuffed post-frisk and until his identity and his criminal status could be determined. For this reason, I respectfully dissent.

The dash- and body-cam footage reveals that the traffic stop in this case lasted for approximately 11 minutes. Just seconds into the stop, Haynes was asked to

---

[7]I do not highlight Iowa Code § 321.438(1) or Haynes's cracked windshield as justification for the *length* of the stop. Instead, it is pertinent to my conclusion that the officers were justified in their *initial* stop of Haynes—a conclusion the majority agrees with. See United States v. Chatman, 119 F.3d 1335, 1340 (8th Cir. 1997) ("[S]o long as police have probable cause to believe that a traffic violation has occurred, the stop is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." (citation omitted)).

produce identification. In response, Haynes handed over a Visa credit card and a Costco card. Officer Steinkamp wrote Haynes's name, address, and social security number on a notepad, then asked Haynes to exit the vehicle. Officer Steinkamp then applied handcuffs, patted down Haynes, and searched Haynes's pockets. These actions took approximately five minutes. Officer Steinkamp left Haynes and Officer Minnehan standing next to the open driver's door of Haynes's vehicle and returned to his patrol car. It took approximately one minute more for Officer Steinkamp to enter the information into the police cruiser's computer terminal. Officer Steinkamp then returned to Haynes to get the correct spelling of his name and reconfirm his birth date and social security number. This took approximately forty-five seconds. Officer Steinkamp returned to his cruiser to re-enter the information. Approximately two minutes and forty-five seconds later—approximately nine minutes and thirty seconds into the stop—Officer Steinkamp returned, and Officer Minnehan removed the handcuffs, advising Haynes he could go on his way. Accordingly, Haynes was in handcuffs for a total of four minutes and forty-five seconds from the conclusion of Officer Steinkamp's patdown and search of Haynes's person to the moment Officer Minnehan removed the handcuffs.

At the conclusion of the patdown and search of Haynes's person, the information available to the officers was that Haynes was party, a few minutes before, to a transaction that law enforcement reasonably suspected to be a hand-to-hand drug deal. The officers did not know whether Haynes was the seller or buyer in the suspected transaction. Although Officers Minnehan and Steinkamp did not find any drugs on Haynes's person, they did find a wad of cash, and Haynes's vehicle had not been searched. Further, the officers were unable to verify Haynes's identity or background because Haynes could not produce a driver's license, offering instead a Visa credit card and a Costco card. The majority offers no authority that these cards could substitute for the production of a driver's license, and indeed it cannot, as Iowa law requires that the driver of a motor vehicle have in his or her possession a valid driver's license with a photo of the driver. See Iowa Code §§ 321.174(3), .189(2)(a), .482. Finally, Haynes stood next to the open driver's door of his vehicle throughout the stop. Accordingly, until the end of the stop when the officers verified

-13-

Haynes's identity via computer search, they had no information as to his outstanding wants or warrants, nor could they even verify his true identity.

I doubt that Haynes has shown the violation of a constitutional right by virtue of the failure of the officers to remove the handcuffs from Haynes's wrists for four minutes and forty-five seconds after the conclusion of the patdown and search. However, even if he has, it was not clearly established on July 26, 2018, that Haynes's Fourth Amendment rights would be violated under these circumstances.

A right is clearly established where the "contours" of that right are "sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" District of Columbia v. Wesby, 138 S.Ct. 577, 589 (2018); see also Anderson, 483 U.S. at 640 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." (citation omitted)). "A plaintiff must identify either 'controlling authority' or 'a robust "consensus of cases of persuasive authority" 'that 'placed the statutory or constitutional question beyond debate' at the time of the alleged violation." Kelsay v. Ernst, 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (citation omitted).

"The state of the law should not be examined at a high level of generality." Id. "[D]oing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." Plumhoff v. Rickard, 572 U.S. 765, 779 (2014). Instead, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." Kelsay, 933 F.3d at 979 (citation omitted). This Court has previously explained that such specificity is of particular importance in the Fourth Amendment context because "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Id. at 979-80 (citation omitted).

-14-

It is well established that "[a]n officer may lawfully continue a traffic stop until 'tasks tied to the traffic infraction are—or reasonably should have been—completed.'" United States v. Soderman, 983 F.3d 369, 374 (8th Cir. 2020) (citation omitted), petition for cert. filed, (U.S. June 1, 2021) (No. 20-8179) (citation omitted). During a traffic stop, "an officer's mission [typically] includes . . . checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez v. United States, 575 U.S. 348, 355 (2015); see also United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) ("[O]ur case law teaches us that a police officer, incident to investigating a lawful traffic stop, may request the driver's license and registration, request that the driver step out of the vehicle, request that the driver wait in the patrol car, conduct computer inquiries to determine the validity of the license and registration, conduct computer searches to investigate the driver's criminal history and to determine if the driver has outstanding warrants, and make inquiries as to the motorist's destination and purpose."). In fact, "[t]hese checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." Rodriguez, 575 U.S. at 355. We have previously explained that the conclusion of a traffic stop may be demarcated by an officer's return of a driver's license to the stopped driver. See, e.g., Jones, 269 F.3d at 925; see also United States v. White, 81 F.3d 775, 778 (8th Cir. 1996) (explaining traffic stop ended when officer returned driver's license and registration to driver); United States v. Espinoza, 885 F.3d 516, 523 (8th Cir. 2018) (finding traffic stop not unconstitutionally extended where officer asked driver without driver's license to sit in patrol car because that request was "directly related to proper completion of the traffic stop").

Further, "an officer may use handcuffs to protect the officers and maintain the status quo during the stop," see Garcia v. City of New Hope, 984 F.3d 655, 668 (8th Cir. 2021) (citation omitted) (finding no constitutional violation where officers handcuffed suspect during traffic stop); see also United States v. Shranklen, 315 F.3d 959, 961 (8th Cir. 2003) ("At any investigative stop—whether there is an arrest, an

-15-

inventory search, neither, or both—officers may take steps reasonably necessary to protect their personal safety."), particularly where drug trafficking is suspected, see, e.g., United States v. Navarrete-Barron, 192 F.3d 786, 791 (8th Cir. 1999); see also State v. Dewitt, 811 N.W.2d 460, 472 (Iowa 2012) ("The suspected criminal activity involved drug dealing, which is a serious crime for which offenders often run from the police."). Even if an officer lacks probable cause, Supreme Court precedent permits a brief detention where that officer has reasonable suspicion that criminal activity is afoot. See Pollreis v. Marzolf, 2021 WL 3610875, at *4 (8th Cir. Aug. 16, 2021) (Grasz, J.). "In making reasonable-suspicion determinations, reviewing courts 'must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.'" Id. (citation omitted). Further, "[w]e have said before that 'a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion.'" Id. (citation omitted). Ultimately, the Fourth Amendment requires that an officer possess "some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose" before handcuffing a suspect during a Terry stop. Id. at *5 (citation omitted).

Against this authority, the majority relies on three cases to explain why the clearly established prong was satisfied: El-Ghazzawy v. Berthiaume, 636 F.3d 452 (8th Cir. 2011); United States v. Tovar-Valdiva, 193 F.3d 1025 (8th Cir. 1999) (per curiam); and Manzanares v. Higdon, 575 F.3d 1135 (10th Cir. 2009). However, all three are factually distinct from the situation presented to Officers Minnehan and Steinkamp, and to find that these cases notified the officers that their conduct was unlawful requires us to regard those cases with an impermissibly "high level of generality." See Kelsay, 933 F.3d at 979. Additionally, Manzanares is just *one* out-of-circuit case and does not constitute a "robust 'consensus of persuasive authority.'" See Wesby, 138 S.Ct. at 589-90 (citation omitted).

It is true that in El-Ghazzawy this Court found the officer's handcuffing and frisk violated the suspect's Fourth Amendment rights where that suspect was "by all

-16-

accounts, calm and cooperative during the entirety of the incident." 636 F.3d at 458-59. However, El-Ghazzawy was suspected of committing "theft by swindle," which we noted "was not a dangerous crime which would cause concern of him being armed and dangerous." Id. at 457 (comparing Johnson, 528 F.3d at 580 ("In light of the dangerousness of the suspected drug trafficking, and the likelihood that [the defendant] had access to a weapon, it was reasonable for the police to restrain [the defendant's] hands.")). We found persuasive the fact that "there was nothing in the dispatch to indicate El-Ghazzawy could be armed or dangerous" and that, despite the non-dangerous nature of his suspected offense, the officer handcuffed El-Ghazzawy seconds after arriving to the scene. See id. at 457-58; see also Pollreis, 2021 WL 3610875, at * 6 (distinguishing El-Ghazzawy, where "no facts indicated that the suspect was dangerous or had a weapon," from situation where officer handcuffed suspects after receiving information that suspects might be armed and suspect made "hand-to-waist" movement). Moreover, a suspect's "compliance is only *one* factor, albeit an important one, in the totality-of-the-circumstances analysis." See Pollreis, 2021 WL 3610875, at *6 (Grasz, J.) (emphasis added).

Tovar-Valdiva and Manzanares are similarly unhelpful, with Tovar-Valdiva discussing a warrantless arrest at a bus stop, see 193 F.3d at 1026-27, and Manzanares discussing a suspect's in-home detention and subsequent three-hour detention in a squad car, see 575 F.3d at 1140-41. There was no Terry stop in Tovar-Valdvia—only a warrantless arrest. See 193 F.3d at 1027. Further, Manzanares was not even suspected of a crime at the time he was handcuffed. See 575 F.3d at 1140. Thus, these cases are not instructive. Here, Officers Minnehan and Steinkamp were working in a high-crime area and responding to a dispatch reporting a suspected hand-to-hand drug transaction involving Haynes. As we expressly noted in El-Ghazzawy and Johnson, and as the majority here recognizes, an officer's response to suspected drug trafficking entails a heightened level of dangerousness—correspondent with a need for heightened safety—not present when responding to reports of non-dangerous crimes such as "theft by swindle." Cf. ante at 8.

In some circumstances, a frisk during a <u>Terry</u> stop will no doubt dispel an officer's suspicion that the suspect is armed and dangerous and that he or she may flee. However, the facts here are not so straightforward. Haynes was suspected of drug activity, which we deem a dangerous crime. <u>See, e.g.</u>, <u>Johnson</u>, 528 F.3d at 580; <u>see also</u> <u>Chestnut v. Wallace</u>, 947 F.3d 1085, 1091 (8th Cir. 2020) ("We think that officers should generally be allowed to believe the information that they receive from or through a dispatcher, even it if later turns out that the facts as relayed are disputed or even untrue, and that that information alone can sometimes justify a detention."). While the check of a driver's name is a routine "mission" of traffic stops, Haynes was unable to produce his driver's license or any other form of government-issued identification upon the officers' request, a misdemeanor offense under Iowa law, <u>see</u> Iowa Code Ann. §§ 321.174(3), .189(2)(a), .482., and this delayed the officers' confirmation of Haynes's identity and his lack of outstanding wants or warrants to the end of the traffic stop. While the search of Haynes's person did not reveal a weapon or contraband, it did reveal a wad of cash in Haynes's pocket. Further, Haynes stood next to the open door of his vehicle, which had not been searched. And ultimately, the entire stop took approximately 11 minutes. <u>See, e.g.</u>, <u>Pollreis</u>, 2021 WL 3610875, at *6 (Grasz, J.) (finding suspects' constitutional rights not violated where the encounter lasted only seven minutes).

It is incongruous that, after finding qualified immunity appropriate in <u>Pollreis</u>, the Court now denies qualified immunity to Officers Steinkamp and Minnehan. In <u>Pollreis</u>, an officer responded to a dispatch call describing suspects who had fled from the scene of a car crash, one of which was likely armed. <u>Id.</u> at *1. The officer stopped two young boys—12 and 14 years old—and held them facedown at gunpoint despite their mother's and stepfather's identification of them; the boys' cooperation; and the frisk of the boys and the search of their backpack, neither of which revealed weapons or drugs. <u>Id.</u> at *2-3. In total, the officer kept the boys handcuffed for approximately 2 minutes and the stop lasted a total of approximately 7 minutes. <u>Id.</u> at *3, *6. When considering a challenge to the length of the stop, the Court explained:

> We do not see this as an unlawfully prolonged investigative stop. *Consider the stop's specific purpose: to identify the boys and to determine if they were, in fact, two people fleeing from the crash.* Even without learning any new suspicious facts during the encounter, *[the officer] was justified in taking the amount of time needed to accomplish those purposes.*

Id. at *4 (Grasz, J.) (emphasis added).

I can see no meaningful distinction between the facts in Pollreis and the facts here. Like the officer in Pollreis, Officers Steinkamp and Minnehan kept Haynes handcuffed only long enough to satisfy "the stop's specific purpose: to identify [Haynes]." Id. The Pollreis Court noted the boys' close proximity to a reported crime scene and appearance, which matched that of the suspects. Id. at *5. Factually, Haynes's story is almost identical: he was stopped near the scene of an alleged hand-to-hand drug transaction and matched the suspect's description given by dispatch. True, there was not "low visibility" during Haynes's stop, and Haynes did not make a "hand-to-waist" movement as one of the boys did. See id. at *5-6. However, the objective of both stops was the same: verify the identity of the handcuffed suspect(s). In Pollreis, the Court held that 7 minutes was not too long to achieve that objective while here, the majority holds that 11 minutes is too long to achieve the same objective. Given the approximate 4-minute difference in the two stops' lengths, I cannot square the Court's two outcomes.

Contrary to the majority's suggestion, it is not my position that handcuffing should be "a routine part of a Terry stop." See ante at 8 n.4. Indeed, handcuffing is inappropriate where there is no indication the suspect is dangerous. However, this is not a situation in which there was an "absence of reasons to believe the subject [was] dangerous." See id. My conclusion is limited to the scenario currently before this Court: the officers were responding to a suspected hand-to-hand drug transaction in a high crime area—a scenario that this Court has repeatedly characterized as inherently dangerous and often associated with weapons—and therefore, until the officers could satisfy the "stop's specific purpose" and identify Haynes, they were

-19-

"justified in taking the amount of time needed to accomplish [that] purpose." Pollreis, 2021 WL 3610875, at *4 (Grasz, J.).

I would grant the officers qualified immunity as, under prong two of the qualified immunity inquiry, it was not clearly established that Haynes should have been released from handcuffs at the conclusion of the patdown and search of his person.  For these reasons, I would affirm the district court.

_____

-20-